STATE OF HAWAII, Plaintiff-Appellee *v.* EDWARD KEN ONISHI, Defendant-Appellant

No. 5109

July 28, 1972

RICHARDSON, C.J., MARUMOTO, LEVINSON, KOBAYASHI, JJ., and CIRCUIT JUDGE KAWAKAMI IN PLACE OF ABE, J., DISQUALIFIED

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by Edward Onishi, the defendant in Criminal No. 41301 of the first circuit court, convicting him of unauthorized possession of a deadly weapon in violation of HRS § 727-25.

The sole question for decision on this appeal is whether the circuit court properly denied Onishi's motion for suppression of evidence. The evidence sought to be suppressed was a pistol which Onishi asserts was seized in violation of his constitutional right to be free from unreasonable search and seizure.

The record shows the following facts regarding the seizure of the pistol:

Early in the morning of April 24, 1970, Detective Trepte of the Honolulu Police Department had a search warrant to search Onishi's apartment at 432 Pau Street in Waikiki, and officers Borges, Wong, and Cruz were assigned to maintain a surveillance of the premises.

The officers were informed by Detective Trepte that the search warrant was issued upon an affidavit furnished by Jaylene Clarke, and listed sundry items of police paraphernalia, such as rifles, blue light, flashlight, finger print kit, and tools, which were taken from Officer Westerling's automobile.

The surveillance was commenced at 1:30 o'clock, a.m., and was continued for three hours. During that period, the officers did not see any person enter or leave the apartment, and no person appeared to be present therein.

At approximately 4:35 o'clock, a.m., the officers responded to a radio transmission from Detective Trepte, and proceeded in their automobile up Pau Street to Ala Wai Boulevard, then on Ala Wai Boulevard for three blocks toward Koko Head to Namahana Street, and down Namahana Street toward Kuhio Avenue. As they approached Kuhio Avenue, they saw Onishi and a female companion walking toward them on Namahana Street. Onishi was carrying two plate lunches, and was walking in a normal manner.

Upon seeing Onishi, the officers pulled their automobile over to the koko head side of Namahana Street, got out of the vehicle, and walked toward him. At that time, the officers were in plain clothes, were armed, but did not have their guns drawn.

As he approached Onishi, Officer Borges identified himself to him as a policeman, stated that there was a search warrant for his apartment, requested him to accompany the officers to the apartment, and, without waiting for his response or other reaction to the request, began a pat down of his outer garments.

In doing so, Borges felt the outline of what appeared to be a pistol in Onishi's left rear pocket. He then placed his hand in that pocket, found a loaded pistol, and arrested Onishi for being offensively armed. His testimony in this regard was as follows:

"I approached Mr. Onishi, I called out to him by name and identified myself as a police officer, displayed my police badge and told him that we had search war-

rant for his residence, if he would please accompany us back to his apartment.

"By this time we were standing almost right next to him, slightly to his rear, and with my right hand I frisked his right pocket, coming over to his left pocket, and I felt an outline of what appeared to be a pistol in his left rear pocket.

"I immediately put my hand into the pocket, removed the pistol, and arrested Mr. Onishi for being offensively armed."

The guidelines for determining the constitutional validity of stop and frisk by law enforcement officers are found in *Terry v. Ohio,* 392 U.S. 1 (1968); *Sibron v. New York,* 392 U.S. 40 (1968); and the recent decision in *Adams v. Williams,* 407 U.S. 143 (1972).

The United States Supreme Court propounded the following guideline in *Terry:*

"[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (392 U.S. 30)

The pertinent statement of the court in *Sibron* is as follows:

"The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he

must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." (392 U.S. 64)

*Adams* basically reaffirmed *Terry* and *Sibron*. It differs from prior decisions only in holding that a police officer may base his decision to stop and frisk on an informant's tip which has sufficient indicia of reliability.

Both *Terry* and *Sibron* contain an implication that a stop and frisk must be based on the officer's personal knowledge or observation of the conduct of the person with whom he is dealing. *Adams* holds that in "some situations — for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime — the subtleties of the hearsay rule should not thwart an appropriate police response."

In connection with the established guidelines, it may be stated, as noted in *State v. Goudy*, 52 Haw. 497, 479 P. 2d 800 (1971), that the intrusion upon personal liberty must be based on something more substantial than inarticulate hunches, and that reasonableness would be judged by an objective standard, namely, whether the facts known by the officer would warrant a man of reasonable caution to believe that the action taken was appropriate.

The State asserts that *State v. Goudy, supra,* would support the stop and frisk here. The case is not applicable.

*Goudy* involved a stop, but not a frisk. There, the police officers were following through on an informant's report regarding transactions in contraband weapons and the defendant's involvement therein. During the investigation, the officers witnessed suspicious conduct on the part of the defendant which tended to confirm the report. Consequently, they stopped the automobile in which the defendant was riding to inquire about the actions observed by them. In doing so, they approached the defendant with drawn pistols, and found a pistol and the butt end of a rifle in open view in the vehicle.

In the decision, this court recognized the right of the

police officers to stop the defendant for such inquiry; and also ruled that their approach with drawn pistols was an appropriate self-protective measure, and did not constitute an arrest of the defendant, in the light of their observation of the defendant's movements which were corroborative of the information that he was dealing illegally in firearms.

Here, the issue is not the right of police officers to stop a person for inquiry regarding his suspicious conduct. Officers Borges, Wong, and Cruz did not observe any suspicious conduct on the part of Onishi when they saw him on Namahana Street. Nor does this case raise an issue regarding the propriety of any self-protective measure which may be taken by police officers in approaching a person for questioning. Borges, Wong, and Cruz were armed, but did not approach Onishi with their pistols drawn.

The issue here is whether a police officer may stop and frisk a person, who is walking on a public street in a normal manner without any indication that he is about to commit a crime or is armed and dangerous, for no reason other than the fact that his apartment is subject to search under a search warrant listing rifles and miscellaneous police gear missing from another officer's automobile as the items to be recovered.

On this appeal, we must review the circuit court judgment upon the evidence contained in the record, not upon matters outside of the record which were improperly presented to this court and not upon any surmise as to matters which Officer Borges might have known about Onishi but were not offered in evidence in the circuit court.

According to the record, the evidence before the circuit court when it denied the motion to suppress consisted of the testimony of Officer Borges, the pistol which Borges took from Onishi, and two cartridges which were found in the chamber of that pistol.

The defense counsel attached to the opening brief on appeal, as appendices thereto, copies of the search warrant; the affidavits of Officers Westerling and Wong, and of Jaleen

Clark[1] in support of the search warrant; and the return of the search warrant. Those documents were not in the file of Criminal No. 41301 when the circuit court heard the motion to suppress, were not introduced in evidence at the hearing on the motion, were not mentioned in the designation of contents of record on appeal, and were not included in the record certified to this court. Consequently, they were improperly attached to the brief, and we may not consider the same, or any contents thereof, except to the extent disclosed in the testimony given by Borges.

In his testimony, Borges made no reference whatsoever to the affidavits of Westerling and Wong. He testified that the search warrant was issued upon the information contained in Clarke's affidavit, and that he and his fellow officers "were aware of this information that Miss Clarke had given to the prosecutor's office." But he gave no testimony regarding the nature of that information.

Because the affidavits of Westerling, Wong, and Clarke were not in evidence, and because Borges did not refer to the affidavits of the two officers and did not testify regarding the contents of Clarke's affidavit, the circuit court could not have premised its denial of the motion to suppress on the information contained in those affidavits.

With regard to the search warrant, Borges testified that he examined it and knew that among the items listed therein were "firearms of the rifle type," but no handguns. He further testified as follows:

"We were informed by Detective Trepte that the search warrant was issued and we were to search for items that were removed from a police officer's car by Mr. Onishi consisting of rifles and other personal police gear like the blue light, flashlight, finger print kit, measuring stick, tools, and all kinds of incidentals that I don't recall all of them."

---

[1]In the transcript, the name of the affiant is spelled Jaylene Clark. Inasmuch as the affidavit is not a part of the record, the name is spelled as it appears in the transcript, in referring to the affiant elsewhere in this opinion.

The knowledge of Borges that the search warrant contained a listing of rifles among the items to be recovered from Onishi's apartment did not justify the frisking in this case. It does not follow from the fact that a person might be keeping contraband rifles in his apartment that he is likely to carry a concealed weapon when he is outside of the apartment. Here, if Onishi had carried a rifle when he was seen by Borges, the rifle would have been in plain view and no frisking would have been necessary.

Also, we do not think that the frisk was justified by the information given to Borges and his fellow officers by Detective Trepte. The information did not provide any warning of a specific impending crime. Detective Trepte did not state any facts from which the officers might reasonably infer that Onishi would be armed and dangerous.

Insofar as the record is concerned, Borges had no prior encounter with Onishi. He had not previously arrested him. Borges testified that he frisked Onishi because he had knowledge that Onishi was a dangerous person and on occasion carried pistols. But he did not point to any particular facts upon which he based that statement. A reading of his testimony shows that his "knowledge" regarding Onishi was no more than a conclusion he reached from the information given by Detective Trepte.

Borges testified unequivocally that he observed no unusual conduct on the part of Onishi when he saw the latter on Namahana Street, that Onishi was walking in a normal manner, that he was not committing any offense, that he did nothing to indicate that he was about to commit some offense, and that nothing in his conduct suggested that he was carrying a weapon.[2]

For police officers to conduct a valid stop and frisk, they must have observed specific conduct on the part of the person

---

[2] In this regard, the testimony of Borges was as follows:

"Q And the defendant was merely walking down the street carrying two plate lunches with a female companion?

"A That is correct, sir.

\*      \*      \*      \*

whom they are about to frisk, or have reliable information, from which they may reasonably infer that criminal activity is afoot and that the person is armed and presently dangerous.

Under the record in this case, Officer Borges did not observe such conduct and did not have such information.

Reversed.

*James G. Jung, Jr.*, Deputy Public Defender, for defendant-appellant.

*Arnold T. Abe*, Deputy Prosecuting Attorney (*Barry Chung*, Prosecuting Attorney, with him on the brief), for plaintiff-appellee.

DISSENTING OPINION OF RICHARDSON, C.J.

I respectfully dissent.

The threshold issue posed in *Terry v. Ohio*, 392 U.S. 1, 15 (1968) was "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest." The Court in *Terry* answered that question in the negative. *Adams v. Williams*, 407 U.S. 143 (1972), elaborates on the guidelines set forth in *Terry*. The Court in *Adams* concluded:

. . . [W]e reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may

---

"Q  He wasn't committing any offense in your presence?
"A  No, sir.
"Q  And I take it the defendant was walking in a normal manner?
"A  That's right, sir.
"Q  And he wasn't doing anything to indicate that he was about to commit some offense?
"A  No, sir.

\*    \*    \*    \*

"Q  And the defendant did nothing that you could observe as you approached him to indicate that he was carrying a weapon, is that correct?
"A  That's right, sir."

vary greatly in their value and reliability. One simple rule will not cover every situation.

The police officers in the instant case were in possession of and familiar with the contents of a search warrant and accompanying affidavits placed before this court by attachment to the defendant's brief. The police officer who patted down the defendant testified that he had personally examined the search warrant. He also testified to being present during part of the time that the informant Jaleen Clarke gave information to the detective in charge of the execution of the search warrant and that the detective informed him as to what she had said. The warrant directed them to search the dwelling of the accused for various articles stolen from a police car, including among other things, a shotgun and rifle. The affidavit of the informer Jaleen Clarke attached to the search warrant accused the defendant of theft of the above-named articles, theft of the police car in which they were carried and of a burglary of a restaurant.[1] All crimes had occurred within six days prior to the confrontation between the defendant and the police officers. The burglary of the restaurant was committed just 24 hours earlier.

The police officer who actually frisked the defendant testified: "Mr. Onishi was frisked by me due to the fact that I had knowledge that Mr. Onishi is a dangerous person . . . and that on occasion Mr. Onishi carries pistols . . . ." If the police officer had not had the information supplied by the affidavit of the informer and relied only on his own opinion as to Mr. Onishi's status as a "dangerous person" and his "knowledge that Mr. Onishi carries pistols" we would be presented with a very different case. Without further evidence as to the reasons why the officer reached these conclusions they come dangerously close to "inarticulate hunches," not sufficient to warrant a man of reason-

---

[1] The affiant attests to having seen "three shotguns, one of which has a double barrel; . . . " in defendant's apartment. Only one shotgun and one carbine are reported to have been stolen from the police officer's car, according to the police officer's own affidavit attached to the search warrant.

able caution to believe that the accused on this occasion would be offensively armed. But the officer who patted down the defendant had information from a named person's affidavit accusing the defendant of having committed at least two felonies within the week.

While the police officers may not have had sufficient evidence to secure a warrant for defendant's arrest, they did have in their possession sufficient evidence to support a stop for further investigation of the reported crimes. Given an adequate evidentiary basis for the focus of police attention upon the accused, our inquiry should then be: Could the police officers reasonably conclude from the reading of the warrant and affidavits that "criminal activity" might "be afoot" and that the person with whom they were dealing might be "armed and presently dangerous?" This question must be answered in the affirmative. The inference that "criminal activity may be afoot" is unescapable. The warrant and affidavits indicate that Mr. Onishi was accused of committing two separate crimes. It would be fatuous to suggest that because the crimes in the instant case had been completed, "criminal activity" is no longer "afoot." To engage in such reasoning is to ignore the relationship of the test of *Terry, supra,* to the police officer's duty to investigate and to confront. The duties of a policeman range from the situation where the officer attempts to prevent crime at its incipiency to the situation where the officer attempts to apprehend perpetrators of crime. Confrontation creates the hazard to the physical safety of the officer and there must be a corresponding right to engage in a protective search. The taking of a law enforcement officer's vehicle and the larcenous removal and secretion of the vehicle's contents, as revealed in the affidavit, certainly form the basis for a reasonable inference that the accused may be the sort of person who stands in open defiance of the law and those chosen to enforce it.[2] Just as the police officer in *Terry*

---

[2]Had the warrant directed the police officers to search the dwelling of a bank teller suspected of embezzling from his employer, it is unlikely that the police

was justified in concluding that he was dealing with daytime robbers who were probably armed, the officers were justified in inferring from the crime committed that the accused was the sort of person who "may be armed and presently dangerous." There is in the instant case additional support for the inference that the accused was armed. The officer testified that the accused was known to carry a gun.

We must not take lightly the right of innocent people to walk our streets unmolested by illegal searches. But we must also protect the police officers who risk their lives on our behalf. "The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams* at 146. It is my conclusion that the police officers acted reasonably, upon reliable information, and that the weapon seized was admissible as evidence.

I would affirm.

---

officers could, from reading such a warrant, reasonably conclude that the accused might be "armed and presently dangerous."