STATE OF HAWAII, Plaintiff-Appellee, *v*. MASAO LYDELL TSUKIYAMA, aka Lydell Masao Tsukiyama, Defendant-Appellant.

NO. 5484

AUGUST 30, 1974

RICHARDSON, C.J., LEVINSON, KOBAYASHI, OGATA and MENOR, JJ.

OPINION OF THE COURT BY OGATA, J.

The defendant, Masao Lydell Tsukiyama, also known as Lydell Masao Tsukiyama, was convicted by a jury of three criminal offenses: (1) possession of harmful drug; (2) possession of narcotic drug; and (3) possession of a firearm by a person convicted of certain crimes. Thereafter the trial court sentenced the defendant to imprisonment for ten years for possession of harmful drug, one year apiece for possession of narcotic drug and possession of firearms by a person convicted of certain crimes, each of these sentences to be served concurrently. He now appeals and alleges for ground of re-

versal that the trial court erred in its refusal to grant his motion to suppress the evidence. For the reasons set forth herein, we affirm each of these convictions.

On December 29, 1972, at about 1:00 a.m., police officer Paul Kohler, while on routine patrol, came upon three parked vehicles along the mauka (north) side of North School Street in Honolulu, an area of the city comprised of a mixture of residences and miscellaneous business establishments. The officer, after noticing these three parked vehicles, saw numerous people standing by the western-most of such parked vehicles, which had its hood up or open, and which will be designated for convenience as vehicle 1. Likewise the vehicle parked behind vehicle 1 will be designated as vehicle 2, and the last parked vehicle will be designated as vehicle 3, which was a blue Comet. Officer Kohler recognized one of the persons among the group by vehicle 1 as Russell Johansen, a person known to Kohler as a "police character," which term Kohler defined as a person who had been in jail for the commission of other crimes. In light of these circumstances, Kohler felt that he should investigate the cause of the congregation around vehicle 1. He informed central police communications that he was leaving his car for such an investigation and at the same time requested for assistance. Officer Kohler parked his car just west of vehicle 1; as he got out and approached vehicle 1, but before he reached that vehicle, he met the defendant who was walking towards the officer. The defendant then asked Officer Kohler for a flashlight. Defendant informed Officer Kohler that vehicle 1 was stalled. The officer then went back to his vehicle, got his flashlight and turned it over to the defendant, who then returned to vehicle 1. Officer Kohler followed the defendant to vehicle 1.

At about that time, other police officers began to arrive at the scene, pursuant to the call for police assistance by Officer Kohler. Officer Albert Kaalele was either the first or second officer to arrive, and he parked his vehicle behind vehicle 3, got out and walked towards vehicle 1. When he saw Officer Kohler safe and well among the group of people around vehicle 1, he started to walk back to his police vehicle, and just

before he reached vehicle 3, he noticed that the person who had been seated on the driver's seat of vehicle 3, at the time he walked towards vehicle 1, had disappeared. So he walked around the front of vehicle 3, and towards the driver's side of that vehicle, when he noticed that the person who had been seated was now lying on the front seat of vehicle 3. Officer Kaalele continued to walk towards his vehicle, and after getting his flashlight from his vehicle, he returned to the passenger side of vehicle 3, opened the door and asked the person lying on the front seat if something might be wrong with him. This person was later identified as Anthony Oh Young. After Oh Young came out from the blue Comet, and as he stood outside, next to its front passenger door, Officer Kaalele then asked Oh Young whose car it was, and he replied by pointing to the group of people around vehicle 1, and said it belongs to "one of the guys up here."

Just then, the defendant, who had been with the group of people around vehicle 1, walked over towards Officer Kaalele, who at that time was conversing with Oh Young. Officer Kaalele asked the defendant if he knew to whom vehicle 3 belonged. Defendant responded "yes, that is mine." Officer Kaalele had noticed a bicycle in the back of vehicle 3, so he asked the defendant whose bicycle was in the car, to which the defendant answered that it belongs to one of his sons. Officer Kaalele then asked the defendant if he had some kind of identification and defendant said that it was in the glove compartment of his car. Officer Kaalele then asked the defendant "would you go and get it?" Without any protest or objection, defendant then proceeded around the front of vehicle 3, to the driver's side, followed by Officer Kaalele, and defendant opened the driver's door. The defendant then entered the vehicle, leaned towards the glove compartment, and with his keys in his right hand, he opened the glove compartment about two or three inches and inserted his left hand into the glove compartment. Officer Kaalele, who stood on the driver's side with his flashlight focused on the glove compartment, watched the movements of defendant's left hand. At that time Officer Dennis Azevedo, who had arrived soon after Officer Kaalele had parked his vehicle behind

vehicle 3, was standing on the passenger side of the same vehicle with his flashlight also shining in the same direction on the glove compartment. Officer Kaalele then saw defendant's left hand touch something, which the officer recognized to be the butt of a revolver. Officer Kaalele then dove into the vehicle for the defendant, and after a scuffle between the officer and the defendant, he was subdued and arrested. Officer Azevedo recovered the gun still in the glove compartment of vehicle 3, and he also recovered from the glove compartment a receptacle containing secobarbitals and three marihuana cigarettes. Likewise, in connection with this search, Officer Newton Harbottle recovered from the same vehicle a brown paper sack which contained three lids of marihuana.

The pre-trial motion to suppress was filed by defendant in the court below on March 21, 1973, and the motion was heard on April 26, 1973. On the same day, after the hearing, the trial court ruled and held that under the circumstances the search was proper, and that the motion was without merit. When the trial of this case began on May 21, 1973, the defendant again orally renewed his motion to suppress during the trial, which was again denied.

At issue is whether the conduct of the police officers at any time before Officer Kaalele observed the butt of a revolver in vehicle 3 constituted a "seizure" of the defendant within the meaning of the Fourth Amendment to the Federal Constitution and Article I, Section 5 of the Hawaii State Constitution.[1]

---

[1] The Fourth Amendment to the Federal Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 5 of the Hawaii State Constitution reads:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures, and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

*Terry v. Ohio,* 392 U.S. 1 (1968), and its progeny make it clear that not every street encounter between the police and the public constitutes a "seizure."

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred. *Terry, supra* at 19, fn. 16.

In order to determine if the defendant's liberty was restrained and he was, therefore, seized, we must evaluate the totality of the circumstances and decide whether or not a reasonably prudent person would believe he was free to go. The officer involved testified that he did not intend to prevent the defendant's departure from the scene. However, it is appropriate to apply an objective standard, rather than a subjective one. It is well settled that when a "seizure" of a person is made, an objective standard must be applied to determine if that "seizure" is reasonable.[2] Likewise, we should use an objective standard to determine whether or not a "seizure" has taken place. *Cf. State v. Delmondo,* 54 Haw. 552, 512 P.2d 551 (1973).

Prior to the time Officer Kaalele began addressing questions to the defendant, he was voluntarily present at the scene of the encounter to aid his acquaintances in repairing or moving a stalled automobile (vehicle 1). When Officer Kaalele inquired the defendant about the ownership of the blue Comet automobile (vehicle 3) and the bicycle observed by the officer in the rear of the vehicle, he did so in a conversational manner. He then asked the defendant if he had some identification. When Mr. Tsukiyama, the defendant, replied that it was in the glove compartment, Officer Kaalele merely asked him if he would go and get it. He did not *order* the defendant to get it or *demand* that he get it. The

---

[2] The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. *Terry v. Ohio, supra* at 21.

officer did not in any way restrain the defendant from leaving, or from going anywhere as he pleased, and there was no indication that he was about to leave his companions. Officer Kaalele's questions to the defendant were not overbearing or harassing in nature, and the officer did not make a show of authority, make any threats or draw a weapon. He only wore a police uniform as required by the department. The mere presence of five to seven uniformed officers on a public street in an urban area at 1:00 o'clock in the morning is not in itself a show of authority or a form of coercion when eight civilians are also present. According to the testimony of the officers, the street was not blocked; the defendant and his acquaintances could have driven from the scene of the encounter. When the defendant voluntarily proceeded to open the glove compartment, Officer Kaalele trained the beam of his flashlight on the defendant's left hand as a safety precaution. The officer, however, did not have his revolver drawn.

Officers Kohler and Kaalele and the other officers did not know the defendant before he was taken to the main police headquarters. The informal questions addressed to the defendant by Officer Kaalele in this factual situation is only a minimal intrusion on his privacy and did not rise to the level of a "seizure" within the meaning of the Fourth Amendment.

While on the surface at least, there was nothing to indicate that defendant and his comrades were engaged in criminal activity or about to engage in such activity, there is no constitutional objection for a policeman merely to inquire of a person on the streets in a proper manner when the individual to whom the questions are addressed is under no compulsion to cooperate. This view was propounded by Mr. Justice White in his concurring opinion in *Terry, supra* at 34:

> There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way.

Pursuant to this line of reasoning the Supreme Court of New Jersey in *State v. Sheffield*, 62 N.J. 441, 446-47, 303 A.2d 68, 71 (1973), reversing an appellate division stated:

14

The Appellate Division went wide of the mark when it limited the the right of a police officer to question a person to a situation involving "highly suspicious activities." A police officer charged with the duty of crime prevention and detection and protection of the public safety must deal with a rich diversity of street encounters with citizens. In a given situation, even though a citizen's behavior does not reach the level of "highly suspicious activities," the officer's experience may indicate that some investigation is in order. Depending on the circumstances, street interrogation may be most reasonable and proper. *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612, 616-617 (1972).

This is not to say that a court, while recognizing the need for effective crime prevention and detection, should not be vigilant to strike down an abuse of the street questioning of a citizen by the police. However, there is no indication that the conduct of the officer in attempting to question defendant was overbearing or harassing in nature. . . .

The dissent herein is bottomed on the assumption that field interrogation by a police officer usually involves a "detention" of the person and has Fourth Amendment implications. The dissent, therefore, would limit such interrogation to a situation where the officer has a "reasonable suspicion of criminal activity." This would practically require an officer to have grounds for an arrest before he could interrogate a person on the street, a test specifically rejected by the Supreme Court in *Terry*. Our conclusion is that mere field interrogation, without more, by a police officer does not involve "detention" in the constitutional sense so long as the officer does not deny the individual the right to move. Nor, if the dissent so intends, could we accept the view that whenever a police officer, without some suspicion of criminal activity, approaches an individual to ask him a question, there is a constitutional wrong which would require the suppression of contraband which the individual discards in response to the approach of the officer.

In *People v. Monson,* 28 Cal. App. 3d 935, 939, 105 Cal.
Rptr. 92, 95 [no Pacific Reporter citation] (1972), the court
recognized the need for "field" interviews by the police:

> It is not unreasonable for officers to seek interviews with
> suspects or witnesses. . . . Otherwise they cannot per-
> form effectively their functions of preventing crime and
> apprehending those reasonably suspected of crime.

In *State v. Baxter,* 68 Wash. 2d 416, 421, 413 P.2d 638, 642
(1966), the Washington State Supreme Court stated:

> There is nothing unreasonable in an officer's questioning
> persons who are out late at night. *People v. Simon,* 45 Cal.
> 2d 645, 290 P.2d 531 (1955). Had he [Baxter] continued to
> walk, or had he remained standing and merely refused to
> talk, the police may well have lacked probable cause to
> arrest him. See *Green v. United States,* 259 F.2d 180 (D.C.
> Cir. 1958), *cert. denied,* 359 U.S. 917, 3 L.Ed. 2d 578, 79
> Sup. Ct. 594 (1959).

In addition the American Law Institute's *Official Draft
No. 1 of A Model Code of Pre-Arraignment Procedure*
provides for police requests for cooperation. Article 110.,
Section 110.1, Subsection (1) *Authority to Request Coopera-
tion,* reads in part:

> A law enforcement officer may, subject to the provisions
> of this Code or other law, request any person to furnish
> information or otherwise cooperate in the investigation or
> prevention of crime. The officer may request the person
> to respond to questions . . . . In making requests pur-
> suant to this section, no officer shall indicate that a per-
> son is legally obliged to furnish information or otherwise
> to cooperate if no legal obligation exists. *Compliance with
> a request for information or other cooperation hereunder
> shall not be regarded as involuntary or coerced solely on
> the ground that such request was made by one known to be
> a law enforcement officer.*"[3] [Emphasis added.]

---

[3] . . . The explicit authorization to the police to seek cooperation, even where this
may involve inconvenience or embarassment for the citizen, and even though many
citizens will defer to this authority of the police because they believe — in some
vague way — that they should, is a clear recognition in the Code that the moral and
instinctive pressures to cooperate are in general sound and may be relied on by the
police. This Section imposes restrictions on requests for cooperation only when

16

While this provision has not specifically been adopted by our legislature, the accompanying comment explicitly states that "[t]his section does not grant any new authority to law enforcement officials."*A.L.I. Model Code, supra* at 4.

The dissent contends that the trial court judge made a finding of fact that defendant was "detained." However, this statement made by the trial judge was not a finding of fact, but just a casual, passing remark made immediately after the defendant renewed his motion to suppress during the trial. No sooner than the trial judge had stated that the defendant was detained, the judge then qualified his statement that it was not an illegal detention. While the trial judge characterized the encounter between the officer and the defendant as a detention, and stated, further, that the detention was not illegal, we think that, based upon the record herein, the trial judge used the word "detention" as being synonymous with the word "intrusion." Of course, the intrusion upon the defendant's privacy, if any, was so minimal that it was neither perceptible, nor appreciable. In any event, the trial judge's carefully considered denial of defense counsel's motion to suppress evidence must be accorded greater weight than a casual comment. Consistent with and implicit in the trial judge's ruling on the motion is a finding that a reasonably prudent person in the defendant's position would not believe that he was in any way restrained of his liberty. The evidence is more than sufficient to support this conclusion. We do not find, as the dissent does, that the record supports a finding that Officer Kaalele deliberately approached the defendant to question him. We view the record as showing that as the defendant walked towards his vehicle, he approached Officer Kaalele who was on the sidewalk close to the right front fender of defendant's vehicle. Officer Kaalele was then conversing with Oh Young. There is nothing in the record to show that the defendant was coerced to do anything by Officer Kaalele. Furthermore, as we indicated, *supra,* every person who meets a police officer on the street has the fundamental right to refuse to cooperate with such police

police conduct is menacing, misleading, or conflicts with particular rights — such as the privilege against self-incrimination. *A.L.I. Model Code, supra* at 100.

officer. The defendant here could have simply refused to voluntarily cooperate with the officer, and that would have ended the encounter.

Many of the cases that expound the standards which must be met for a constitutionally reasonable "stop" or "seizure," beginning with *Terry*,[4] need not be considered in the present case, since no "stop" or "seizure" took place. The case now before us can be distinguished on its facts from the numerous cases in which the *Terry* standards have been applied.

In each of the *"Terry* progeny" cases,[5] relied upon by the state as well as by the defendant, there was an element of command, authority, force, threat, coercion, physical stopping or restraint present. This crucial element was lacking in the instant case until *after* defendant put his hand on the gun. At that point probable cause for arrest arose. *State v. Wakinekona*, 53 Haw. 574, 499 P.2d 678 (1972). Since there was, therefore, no "stop" or "seizure" of the defendant prior to his overtly unlawful act, we do not have to decide whether the

---

[4] The test set forth in *Terry*, *supra* at 30-31, reads as follows:

"We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

[5] *See*, State v. Delmondo, *supra;* State v. Onishi, 53 Haw. 593, 499 P.2d 657 (1972); State v. Goudy, 52 Haw. 497, 479 P.2d 800 (1971); Adams v. Williams, 407 U.S. 143 (1972); Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966); United States v. Pearce, 356 F. Supp. 756 (D.C.E.D. Pa. 1973); Bailey v. United States, 389 F.2d 305 (D.C. Cir. 1967); Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966); United States v. Ragsdale, 470 F.2d 24 (5th Cir. 1972); Flores v. Superior Court, 17 Cal. App. 3d 219, 94 Cal. Rptr. 496 (1971); Irwin v. Superior Court, 1 Cal. 3d 423, 82 Cal. Rptr. 484, 462 P.2d 12 (1969); State v. Junious, 30 Cal. App. 3d 432, 106 Cal. Rptr. 344 (1973); Restani v. Superior Court, 3 Cal. 3d 320, 91 Cal. Rptr. 429 (1970); State v. Taras, 19 Ariz. App. 7, 504 P.2d 548 (1972); People v. Barksdale, 14 Ill. App. 3d 415, 302 N.E.2d 718 (1973); People v. Loveland, 71 Misc. 2d 935, 338 N.Y.S.2d 548 (1972); People v. Rivera, 14 N.Y.2d 441, 201 N.E.2d 32 (1964).

18

circumstances could have given rise to a belief that "criminal activity may have been afoot"[6] and thus justify a "stop" or "seizure." We find that the conduct of the police officers was constitutionally reasonable.

Affirmed.

*David S. Hobler,* Deputy Public Defender *(Donald K. Tsukiyama,* Public Defender, of counsel), for defendant-appellant.

*Michael A. Weight,* and *Charlotte E. Libman,* Prosecuting Attorneys *(Barry Chung,* Prosecuting Attorney, of counsel), for plaintiff-appellee.

### DISSENTING OPINION OF LEVINSON, J.

I dissent.

The defendant was convicted by a circuit court jury of unlawfully possessing a revolver, marijuana and secobarbital, a barbiturate. In this appeal he contends the trial court erred in not suppressing these items, which he claims were seized by the police in violation of his state and federal constitutional rights. I agree, and therefore would reverse the judgment and sentence of the trial court.

I state the police version of the facts. At approximately one o'clock on the morning of December 29, 1972, officer Paul Kohler of the Honolulu Police Department was on patrol in his automobile driving in an Ewa direction on North School Street in the Nuuanu section of Honolulu. On the mauka side of that street, near a pool hall that had just closed, officer Kohler observed three cars parked in a row, the lead car of which had its hood elevated. Ten or twelve men, including the defendant, were gathered around this automobile. Officer Kohler recognized one of the men as a "police character" — an individual he defined as someone who has "been in jail before for other crimes"; he did not know the defendant or any of the other men present.

Because he wanted to see what the men were doing there "at that time of the morning," officer Kohler parked his car

---

[6]*Terry, supra* at 30.

and transmitted a request for assistance on his radio. He planned to conduct an "I.C.," which he described as a procedure "to interrogate suspicious looking persons at odd hours of the day or night in residence or business areas or an uncommonly large number of people." While he perceived nothing otherwise suspicious about the defendant's behaviour, officer Kohler felt that an "I.C." was appropriate because the individual he recognized as a "police character" and the defendant "were in the same group."

After his call for assistance, officer Kohler left his automobile and began walking towards the group of men. He was then approached by the defendant, who asked him for the use of a flashlight to assist work on the engine of the apparently stalled lead car. Officer Kohler accordingly lent the defendant a flashlight, recognizing by that time that the men were concerned with car trouble only and that they were conducting themselves in a manner neither illegal nor suspicious.

Officer Kohler did not, however, retract his call for assistance. In a short while, an entire "task force" of police arrived at the scene — including at least ten officers and two "task force" vehicles. One of the newly arrived policemen — officer Albert Kaalele — observed an individual lying on the front seat of one of the three original parked cars, a blue Comet. He also saw a bicycle on the back seat of that car. Officer Kaalele told the man to get out of the Comet, and asked him to whom the car belonged. The man indicated the defendant as the owner. Officer Kaalele then approached the defendant and inquired whether the defendant was the owner of the Comet. When the defendant responded affirmatively, officer Kaalele asked him to whom the bicycle in the back seat of the Comet belonged. The defendant stated it belonged to one of his sons.

By this time officer Dennis Azevedo had joined officer Kaalele. Neither officer had ever seen the defendant before this time, and neither officer suspected him of any criminal activity. Nonetheless, according to officer Azevedo, the defendant "was asked [by officer Kaalele] to furnish identification which, at this time, he stated it was in

his glove compartment of his vehicle.'' Officer Kaalele testified "I asked him for some kind of I.D., if he had it on him.'' When the defendant indicated his identification was located in the glove compartment of his car, according to officer Kaalele, "I told him: 'Would you go and get it?' ''

Followed closely by officers Kaalele and Azevedo, the defendant then "walked'' or "proceeded'' back to his automobile. The officers stationed themselves on either side of the automobile, at the front doors, and shone their flashlights on the glove compartment when the defendant began to open it. As the defendant was reaching inside the illuminated compartment the officers glimpsed the butt end of a revolver. Officer Kaalele immediately grabbed the defendant, wrestled him to the ground, then handcuffed and arrested him. The revolver was retrieved from the glove compartment, and an ensuing search of the car revealed the marijuana and barbiturates upon which the drug charges against the defendant were based.

The trial court denied the defendant's pre-trial motion to suppress without making findings of fact for the record. However, the defendant renewed his motion to suppress at trial, at which time the trial court expressly found, "I don't believe [Tsukiyama] was under arrest but he was being detained.'' To the defendant's argument that he had been "illegally'' detained, the trial court responded, "I disagree.'' The record is clear, therefore, that the trial court found as a matter of fact that the defendant was subject to investigative detention by the police. It is equally clear that the trial court based its denial of the motion to suppress on a conclusion that the facts justified the detention.

The threshold question for this court hence becomes whether the trial court's factual finding that the defendant had been forcibly stopped and required to furnish identification prior to his act of reaching into the glove compartment of his car is premised on substantial evidence in the record. *Cf. State v. Price,* 55 Haw. 442, 521 P.2d 376 (1974). I am persuaded the evidence fully supports the trial court's finding in this regard. Officer Kohler's call for assistance evoked the emergency response of an entire task force of police vehicles

and personnel. Surrounded by police, the defendant was "asked to furnish" identification; he was "told . . . would you go and get it" when he stated his identification was elsewhere; he was closely accompanied by two armed officers on his "walk" back to his car; once inside the car, he was blocked from egress by an officer standing at each of the front doors. Certainly the defendant's testimony indicates he subjectively *felt* deprived of his freedom to ignore the demand for identification and leave. Although officer Kaalele testified at trial that the defendant could have left at will, no one bothered to communicate this to the defendant at the time of the incident. Indeed, officer Kohler, who called for assistance for the purpose of conducting an "I.C." of *all* of the men, including the defendant, testified that in the "I.C." procedure an individual is "[n]ot really" free to leave until he complies with an officer's request for identification.

In *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968), the United States Supreme Court suggested a test, particularly appropriate to the facts of this case, for determining when a "seizure" has occurred within the meaning of the fourth amendment. Seizure occurs, it stated, "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." In the present case, the emergency response of a task force of police vehicles and personnel to the scene, the imperative manner in which the police "asked" the defendant to produce identification, the two-on-one police escort of the defendant to his car, all combined to produce a "show of authority" by the police under the terms of which the defendant's freedom to leave was conditioned on his compliance with their demands for identification. *Cf. State v. Kaluna*, 55 Haw. 361, 371 N.7, 520 P.2d 51, 60 n.7 (1974). In any event, I am unable to say the trial court was clearly erroneous in its express finding to this effect.

I am equally persuaded, on the other hand, that the trial court erred in finding the defendant's detention justified by the circumstances. I say so having considered the facts in that light most favorable to the prosecution. Indisputably the

defendant's detention was a "seizure" within the meaning of the federal and state constitutions. U.S. CONST. amends. IV & XIV; HAWAII CONST. art. I, § 5; *Adams v. Williams,* 407 U.S. 143 (1972); *State v. Joao,* 55 Haw. 601, 525 P.2d 580 (1974). And a seizure of the person is subject to the constitutional rule of reasonableness, which requires, in the case of an investigative detention on less than probable cause, that the detaining police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 605, quoting *Terry v. Ohio, supra* at 21. Yet the record is explicit that officers Kohler, Kaalele and Azevedo found nothing suspicious in the defendant's conduct other than his "association" with a "police character" at a late hour. Mere association with known criminals, however, does not justify a forcible stop. *Sibron v. New York,* 392 U.S. 40 (1968). Nor does presence on the street at a late hour, even of a reputedly dangerous individual. *State v. Joao, supra; State v. Onishi,* 53 Haw. 593, 499 P.2d 657 (1972). Indeed, in this case the police avowedly and unqualifiedly recognized the legitimate nature of the defendant's activity — the repair of a stalled car. This alone is fatal to the contention that the police perceived specific and articulable facts which reasonably suggested to them that the defendant was engaged in criminal activity. *See Irwin v. Superior Court,* 1 Cal. 3d 423, 427, 462 P.2d 12, 14, 82 Cal. Rptr. 484, 486 (1969) ("Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful"). Since the record reveals no other facts to buttress the trial court's legal conclusion that the defendant's detention was constitutionally permissible, I must conclude it erred in not suppressing the evidence seized as a result of that detention.

I have always thought that in this country, at least, the police are constitutionally precluded from accosting an individual on the street and demanding that he produce identification papers, unless they hold an articulable and reasonable suspicion that the individual is involved in illegal activity. Viewed in a light most favorable to the prosecution, the facts of the present case leave no doubt that the defendant was

"seized" by the police and that his seizure was unjustified. I would therefore reverse.