**STATE OF HAWAI'I**, Respondent–Appellee, v. **MICHAEL KEARNS**, Petitioner–Appellant

NO. 15451

(CR. NO. 89–1374)

FEBRUARY 4, 1994

KLEIN, ACTING C.J., LEVINSON, NAKAYAMA, JJ., CIRCUIT COURT JUDGE SOONG, IN PLACE OF MOON, C.J., RECUSED, AND CIRCUIT COURT JUDGE SHIMABUKURO, ASSIGNED BY REASON OF VACANCY

## OPINION OF THE COURT BY KLEIN, J.

Michael Kearns was charged with one count of Promoting a Dangerous Drug in the First Degree in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp. 1992) and one count of Promoting a Dangerous Drug in the Second Degree in violation of HRS § 712–1242(1)(b)(i) (Supp. 1992). The circuit court denied Kearns's pre–trial motion to suppress evidence and, in a subsequent jury–waived trial, found him guilty as charged. The Intermediate Court of Appeals (ICA) affirmed the denial of the motion to suppress and the subsequent convictions in a published opinion. *State v. Kearns*, No. 15451, slip op. (Haw. App. Feb. 4, 1993), *cert. granted*, 74 Haw. 652, 849 P.2d 81 (1993).

We subsequently granted Kearns's petition for a writ of certiorari to review the ICA's decision. For the reasons set forth below, we vacate Kearns's convictions, reverse the order denying his motion to suppress, and remand to the circuit court for the entry of an order dismissing the charges against him. In addition, we order depublication of the ICA's opinion.

## I. FACTS

In the early afternoon of August 30, 1989, Officer Timothy Slovak (Officer Slovak) of the Honolulu Police Department's Narcotics Division was monitoring the passengers arriving at Honolulu International Airport on a flight from Los Angeles, which, according to Officer Slovak, is a "drug source city." Kearns was one of the first people to exit the plane, was wearing a jacket, and had one carry–on item (a suit bag). Kearns, instead of boarding

a nearby shuttle bus, walked quickly and directly to the baggage claim area. While Kearns walked to the baggage claim area, he reached around and "fondled" his middle back area, as if adjusting something under his clothing. Upon entering the baggage claim area, Kearns "looked around in the claim area as if looking for something or someone." When his suitcase arrived on the luggage carousel, Kearns immediately picked it up and headed towards the exit. Kearns stopped momentarily approximately ten feet from the exit and it "appeared . . . he was looking out the door for maybe someone to show up at the curb."

Officer Slovak, armed but dressed in jeans and a T–shirt, approached Kearns, identified himself as a police officer assigned to the narcotics division, displayed his badge, and asked for some time to speak with Kearns. Officer Slovak described his attitude towards Kearns as "polite with a moderate voice." Kearns said "sure" to the officer's request and asked if there was a problem. Officer Slovak told Kearns that he was involved in drug interdiction, was trying to stop narcotics coming in through the airport, and that his actions were "routine." Officer Slovak did not, however, tell Kearns that he was free to leave at any time or that he was free to decline to answer any questions.

Officer Slovak then asked to see Kearns's airline ticket and driver's license. Kearns complied with the requests, and with trembling hand, gave Officer Slovak his ticket and driver's license. After noticing that the ticket was for a one–way trip, was purchased that day with cash, and that the names on the ticket (Tom Hall) and driver's license (Michael Kearns) did not match, Officer Slovak asked Kearns questions regarding where he lived, his employment, and the name discrepancy. Kearns

answered these questions and asked if travelling with someone else's ticket was illegal. Officer Slovak allegedly responded, "no, but drug smugglers use it all the time."

At that point, more people began to proceed through the exit, and Officer Slovak asked Kearns to move further inside the terminal. Officer Slovak then asked to search Kearns's bags. Kearns again complied and watched as Officer Slovak searched his bags. No contraband was found in any of Kearns's bags. After completing the search of the bags, Officer Slovak returned Kearns's ticket and driver's license. During this time, Officer Slovak felt that Kearns was "overcooperative,"[1] was sweating more than would be normal, and appeared nervous because his hands were shaking when he put his license back in his wallet. Officer Slovak also felt that Kearns was trying to keep some distance between them and appeared to be keeping his back from view. Fearing that Kearns was concealing a gun,[2] Officer Slovak informed Kearns that he was going to frisk him. After Kearns refused to be frisked, Officer Slovak, while keeping one hand on his gun, reached towards Kearns with his other hand. Although Kearns backed away, Officer Slovak was eventually able to reach around Kearns's back and there-

---

[1] Officer Slovak stated, "Most people that I've stopped and not found drugs, they don't mind, but you do see an annoyance, or at least an expression of annoyance on their face or an inflection of it in their voice. This didn't occur with Mr. Kearns."

[2] In the order denying the motion to suppress, the circuit court found that "[d]ue to Defendant's behavior, Officer Slovak feared for his safety because Defendant acted as though he had concealed weapons upon his waist area." Although the paucity of supporting facts causes us to question this finding, because we dispose of this case on other grounds, we do not consider the issue further.

upon felt a bulky pad about four or five inches wide underneath Kearns's jacket.

No longer fearing that Kearns had a gun, but unsure what was in the bulky pad, Officer Slovak offered Kearns two options: consent to a search of his person or undergo a dog sniff. When Kearns refused to be searched, Officer Slovak informed Kearns that he would be detained for a dog sniff. Sampson, a dog trained in narcotics detection, was brought in to conduct the dog sniff. The dog sniff, conducted in a separate office, indicated the presence of narcotics both in Kearns's bags and on his person. Consequently, Officer Slovak placed Kearns under arrest, searched him, and retrieved a bundle that had been taped around his midsection. The bundle was later inspected pursuant to a warrant and found to contain approximately 28 grams of cocaine and 370 grams of heroin.

Kearns unsuccessfully moved to suppress all evidence gained as a result of the encounter with Officer Slovak. Following the denial of the motion to suppress, a jury-waived trial was held consisting mainly of stipulated testimony based on the testimony given at the hearing on the motion to suppress. Kearns was convicted of both charges and sentenced to concurrent prison terms. The ICA affirmed the convictions on appeal and Kearns thereafter filed a petition for a writ of certiorari. On March 24, 1993, we granted his petition and issued a writ of certiorari to review the ICA's decision.

Kearns's principal argument is that the motion to suppress should have been granted because the encounter with Officer Slovak was a warrantless seizure unsupported by reasonable suspicion. In addition, Kearns argues that Sampson did not reliably "alert" on Kearns's person, that the application for the warrant to search the bundle failed to adequately document Sampson's training

and experience, and that Kearns should have been allowed access to Sampson's training and maintenance records in order to challenge the affidavit. Because we agree with Kearns on his first point, we do not address the other issues.

## II. DISCUSSION

We recently considered the constitutionality of a similar police–citizen encounter in *State v. Quino*, 74 Haw. 161, 840 P.2d 358, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied*, 113 S. Ct. 1849 (1993). We observed that

> [t]he Honolulu Police Department's Narcotics/ Vice Airport Detail (HPD) utilizes a "walk and talk" drug interdiction program in order to arrest drug smugglers and to seize any narcotics they might be carrying on their persons or in their luggage. This "walk and talk" program does not employ any type of "drug courier profile" or require the officers to have a reasonable suspicion that a person may be in possession of illegal drugs, or may be engaged in criminal activity. Instead, members of the detail are trained to engage in "consensual encounters" whereby airline passengers are approached and, in a "conversational manner," requested to consent to a search of their luggage or person.

*Quino*, 74 Haw. at 163–64, 840 P.2d at 360 (footnote omitted). We expressed our displeasure with the program, noting that

> [i]n a staged police–citizen encounter such as this, the police exercise complete control over the interaction. The course of the questioning and the

insinuative nature of the questions are left entirely to the discretion of the officer. . . . Moreover, the circumstances beget an obligation by the citizen to reply to any and all questions, no matter how intrusive, lest the authorities deem one's conduct suspicious.

*Id.* at 172–73, 840 P.2d at 363. In holding that Quino's rights under article I, section 7 of the Hawai'i Constitution had been violated, we stated:

We cannot allow the police to randomly "encounter" individuals without any objective basis for suspecting them of misconduct and then place them in a coercive environment in order to develop reasonable suspicion to justify their detention. . . . Such a procedure is anathema to our constitutional freedoms.

*Id.* at 175–76, 840 P.2d at 365.

The prosecution nonetheless argues that Officer Slovak's questioning in the instant case was valid because it occurred during the course of a "consensual encounter." In *Quino*, we followed a two–step analysis to determine whether the State could justify the pre–arrest questioning of an individual as a "consensual encounter." Under that analysis, the court must first determine at what point, if at all, the individual was "seized." The court must then determine if, prior to the seizure, the individual voluntarily and intelligently consented.[3] Because of the

---

[3] The United States Supreme Court includes the element of consent in its determination as to whether the defendant was "seized" in the first instance. *See Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382 (1991). Because the determination as to whether a reasonable person would feel free to leave is an objective question while the determination

manner in which the lower courts have applied the *Quino* analysis in this and other cases, *see, e.g.*, *State v. Hall*, No. 15802, slip op. (Haw. App. Feb. 12, 1993), *cert. granted*, 74 Haw. 652, 849 P.2d 81 (1993), we feel it is necessary to clarify the "consensual encounter" analysis.

## A. Seizure

The first step of the analysis is to determine when, if at all, a "seizure" in the constitutional sense occurred during the encounter. Under the test approved of in *Quino*, a person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. 74 Haw. at 168–73, 840 P.2d at 362–64. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews *de novo*. *See State v. Tsukiyama*, 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974).

In *Tsukiyama*, police officers stopped to render assistance to a group of cars parked along a roadway, one of which had its hood up. The defendant, who initially approached a police officer to ask for assistance, was asked questions regarding one of the automobiles in which the officer had observed something that appeared suspicious. The officer was not, however, investigating the defendant for any specific criminal activity, nor was the defendant under the impression that he was being investigated. Under those circumstances, we held that the limited questions posed by the police did not violate the defendant's constitutional rights.

In *Quino*, on the other hand, the officers "initiated their encounter with Quino and his companions for the

---

as to whether the defendant consented to the questioning is a subjective one, we prefer to separate the analysis into two distinct issues.

specific purpose of investigating possible drug trafficking by them." 74 Haw. at 171–72, 840 P.2d at 363. Although the officers did not initially reveal their investigative objective, the questions asked did not involve the activities of any third parties but were "specifically designed to elicit responses that would either vindicate or implicate the men." *Id.* at 172, 840 P.2d at 363. In those circumstances, we held that Quino had been unconstitutionally seized.

Our analyses in these cases are consistent with the proposition that

> when the activities of law enforcement officials convey the impression that an investigation of specific and identifiable criminal activity has commenced and they have reason to believe that the citizen is involved or possesses relevant information, a reasonable person is more likely to believe that he or she is not free to ignore the official request and walk away.

Williamson, *The Dimensions of Seizure: The Concepts of "Stop" and "Arrest"*, 43 OHIO ST. L.J. 771, 778 (1982). Accordingly, we hold that a person is seized, for purposes of article I, section 7 of the Hawai'i Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information.

In the encounter between Kearns and Officer Slovak, Kearns did not need assistance of any kind, nor was he a potential witness in the vicinity of a recently committed or ongoing crime.[4] On the contrary, Officer Slovak's ques-

---

[4] A reasonable person feels a much stronger compulsion to cooperate with police when that person is the subject of the questioning than

tions were designed to investigate Kearns for drug possession, and Kearns was expressly made aware of that from the outset. Thus, Kearns was seized when Officer Slovak began to ask him for information. In this case, Officer Slovak began the questioning by asking Kearns to produce his driver's license and airline ticket. Under these circumstances, the following statements from Justice Brennan's concurring opinion in *Florida v. Royer*, 460 U.S. 491 (1983), clearly apply to the encounter:

> For plainly [the defendant] was "seized" . . . when the officers asked him to produce his driver's license and airline ticket. . . . By identifying themselves and asking for [the defendant's] airline ticket and driver's license the officers, as a practical matter, engaged in a "show of authority" and "restrained [the defendant's] liberty." It is simply wrong to suggest that a traveler feels free to walk away when he has been approached by individuals who have identified themselves as police officers and asked for, and received, his airline ticket and driver's license.

460 U.S. at 511–12 (citations omitted).

## B. Consent

The conclusion that a warrantless seizure occurred does not end the analysis. We have recognized a few exceptions to the warrant requirement of article I, section 7 of the Hawai'i Constitution in the context of seizures:

---

when the person is approached as a potential witness to the activities of others. *See* 3 W. LaFave, Search and Seizure § 9.2A at 107 (2d ed. Supp. 1994) ("in some instances it will be established that the person did consent to the encounter, most likely when that person was dealt with as a witness rather than a suspect").

the police may arrest an individual if they have probable cause to believe that the individual is committing or has committed an offense, *State v. Lloyd*, 61 Haw. 505, 509, 606 P.2d 913, 916 (1980); the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot, *State v. Melear*, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981); and the police may engage in an investigative encounter with an individual if the individual "consents."[5] *Quino*, 74 Haw. at 173–75, 840 P.2d at 364–65.[6] In the instant case, the police observed Kearns arrive on a flight from Los Angeles wearing a jacket and carrying a suit bag, "fondle" his back while walking quickly to the baggage claim area, look around upon

---

[5] An individual's "consent" must, of course, be given prior to the seizure. Most seizures, however, occur at the inception of interaction between the police and the individual. In those situations, there is virtually no way that the individual could consent prior to the seizure. For this reason, the consent exception to the warrant requirement will rarely be applicable.

[6] Some cases have suggested, without explicitly deciding, that there is a "roadblock" exception to the warrant requirement of article I, section 7 of the Hawai'i Constitution wherein the police may conduct suspicionless stops in certain circumstances if the stops are performed on a uniform basis and in strict conformity with statutory authorization. *See State v. Fedak*, 9 Haw. App. 98, 825 P.2d 1068 (1992) (holding that defendant was illegally seized at intoxication control roadblock where police officer moved the location of the roadblock without statutory authorization); *State v. Aguinaldo*, 71 Haw. 57, 782 P.2d 1225 (1989) (apparently accepting appellant's stipulation that stop at intoxication control roadblock was constitutionally valid). Even assuming that we were to recognize the "roadblock" exception as valid, that exception would clearly be inapplicable in this case because the police were not acting pursuant to any statutory authorization and, more importantly, they did not question Kearns during a uniform "roadblock"–type stop but began an individualized investigation of him based on little more than a hunch.

entering the baggage claim area, retrieve his suitcase when it arrived on the luggage carousel, and stop momentarily near the exit to look outside. These observations clearly provided neither probable cause to believe that Kearns was committing a crime nor a reasonable suspicion that criminal activity was afoot. Thus the seizure could only be justified if Kearns consented.

Most of our cases considering consent as an exception to the warrant requirement of article I, section 7 of the Hawai'i Constitution have dealt with *searches*. *See, e.g.*, *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984); *State v. Patterson*, 58 Haw. 462, 571 P.2d 745 (1977); *State v. Price*, 55 Haw. 442, 521 P.2d 376 (1974). In that context, we have recognized that the State may conduct an otherwise unconstitutional search if the person to be searched freely and voluntarily gives his or her consent. *State v. Bonnell*, 75 Haw. 124, 147–48, 856 P.2d 1265, 1277 (1993). The police are not required to inform the person to be searched of his or her right to refuse consent, but their failure to so inform is a factor to be considered in determining whether consent to a search was freely and voluntarily given. *Nakamoto v. Fasi*, 64 Haw. 17, 21, 635 P.2d 946, 951 (1981). Although this rule is appropriate in the context of searches where the scope of the search is generally well–defined and limited to a particular item or area at the time consent is given, it is not equally applicable to seizures. The rule is particularly inappropriate in the context of the "walk and talk" program where the seizure is an ongoing interrogation of increasing intrusiveness whose scope is not revealed to the individual at the outset. Accordingly, in *Quino*, after noting what we had "previously held" regarding consents to searches in *Nakamoto*, we concluded that the rule did not apply where

the HPD officers approached Quino during a "walk and talk" investigative encounter and failed to disclose that he was free to leave at any time, stating that "[c]onsent, based upon such material nondisclosures, can hardly be viewed as either voluntary or intelligent." 74 Haw. at 174–75, 840 P.2d at 364. In addition, we held that mere acquiescence to questioning, in and of itself, is insufficient to establish consent to the seizure. *Id.* at 175, 840 P.2d at 364. Thus, an investigative encounter can only be deemed "consensual" if (1) prior to the start of questioning, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) the person thereafter voluntarily participated in the encounter.

It is appropriate to require police officers who wish to question individuals without even a reasonable suspicion of criminal activity to ensure that the individuals are aware of their rights, because "no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights." *Escobedo v. Illinois*, 378 U.S. 478, 490 (1964) (discussing Fifth Amendment right against self–incrimination). Moreover, "[i]f the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Id.* (footnote omitted).

In the instant case, Kearns was seized when Officer Slovak began to ask him for information by requesting that he produce his airline ticket and driver's license. The State concedes that prior to that time Kearns had not been informed of his right to decline to participate in the encounter or that he could leave at any time. Thus,

Kearns could not have "consented" to the seizure. To allow the police to engage in suspicionless, nonconsensual, investigative encounters with travelers in airport terminals would be tantamount to sanctioning the type of general warrant that the constitutional guarantee against unreasonable searches and seizures was designed to prevent. *See Florida v. Bostick*, 501 U.S. 429, ___, 111 S. Ct. 2382, 2389 (1991) (Marshall, J., dissenting) ("suspicionless police sweep of buses in intrastate or interstate travel [] bears all of the indicia of coercion and unjustified intrusion associated with the general warrant"). Therefore, all evidence obtained as a result of Officer Slovak's "encounter" with Kearns was illegally obtained and should have been suppressed.

## III. CONCLUSION

Kearns was seized when, in an encounter initiated by the police for the express purpose of investigating Kearns for drug trafficking, Officer Slovak began to ask him for information. Kearns's acquiescence to the questioning did not constitute "consent" because Officer Slovak had not informed him of his right to decline to participate in the encounter or that he could leave at any time. Because Officer Slovak had no other basis upon which to justify the seizure, all evidence obtained as a result of the seizure should have been suppressed. Therefore, the trial court's order denying Kearns's motion to suppress must be reversed. Accordingly, we reverse the ICA's decision affirming the trial court's order and order the ICA's opinion depublished.

The State has no evidence other than the evidence obtained as a result of Officer Slovak's unconstitutional seizure upon which to convict Kearns of Promoting a Dangerous Drug in the first or second degree. Therefore,

we vacate Kearns's convictions and remand for the entry of an order dismissing the charges against him.

On the briefs:

*David Bettencourt*, for petitioner–appellant.

*James H.S. Choi*, Deputy Prosecuting Attorney, for respondent–appellee.

*Carl M. Varady*, for Amicus Curie American Civil Liberties Union of Hawai'i Foundation.

## CONCURRING OPINION BY LEVINSON, J.

In my view, today's opinion of the court contains two central and controlling propositions. The first is that "a person is seized, for purposes of article I, section 7 of the Hawai'i Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information." Opinion of the court at 567. The second is that "an investigative encounter can only be deemed 'consensual' if (1) *prior to the start of questioning*, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) the person *thereafter* voluntarily participated in the encounter." *Id.* at 571 (emphasis added).

In order to avoid any potential doubt on the subject, I write separately to emphasize two significant corollaries to our holdings, one of which is expressly stated in the opinion of the court and the other clearly implied.

First, there can be no "consent" to a "seizure" once the seizure has occurred in the constitutional sense, that is,

after the seizure has *already* been effected. *Id.* at 569 n.5. Therefore, where a seizure coincides with or precedes "interaction between the police and [an] individual," *id.*, it follows tautologically that the seizure cannot be constitutionally justified on the ground that the individual has "consented" to it.

The second corollary derives from our recognition that "the determination as to whether a reasonable person would feel free to leave is an *objective* question while the determination as to whether the [person] consented to the questioning is a *subjective* one[.]" *Id.* at 565–66 n.3 (emphasis added). By its very nature, however, the subjective component of the inquiry regarding consent *cannot* be a matter of whether the seized person has been informed that he or she has the right to decline to participate in the encounter and is free to leave at any time. After all, the person either has or has not been so informed. In the present case, Kearns was not so informed, and thus, as a *per se* matter, he "could not have 'consented' to the seizure" of his person. *Id.* at 571–72. Accordingly, the subjectivity of the "consent" determination springs by definition from the question whether, *after* being given the pre-requisite advice by the police, the person "voluntarily participate[s] in the encounter." *Id.* at 571.

It therefore follows that, even if a "seized" person is given the prerequisite advice by the police, the court must still determine on the record before it whether the person has participated in the encounter "voluntarily." If the participation is voluntary, then the person has "consented" to the encounter; if it is not, then the person has not given "consent." Whether a person has "consented" to an investigative encounter is a question of law that is dependent upon the facts and circumstances of the particular case, and, for that reason, would be subject to the

"clearly erroneous" standard of review. *AIG Hawaii Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citations omitted); *Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 886 (1991) (citations omitted).