Electronically Filed
Supreme Court
SCWC-14-0001042
28-JUN-2019
02:26 PM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellant,

vs.

JAMES WELDON, also known as James William Weldon,
Petitioner/Defendant-Appellee.

SCWC-14-0001042

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0001042; CR. NO. 13-1-1351)

JUNE 28, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

Article I, section 7 of the Hawai'i Constitution

ensures that "[t]he right of the people to be secure in their

persons, houses, papers and effects against unreasonable

searches, seizures and invasions of privacy shall not be violated[.]"  This right is guaranteed to every person, without regard to the wealth of the individual or the place and time at which the individual is stopped.  In this case, we reaffirm these fundamental principles and conclude that evidence discovered when the police illegally stopped and seized Petitioner/Defendant-Appellee James Weldon (Weldon) is inadmissible at trial.

In the early morning of June 4, 2013, Weldon was approached by Honolulu Police Department (HPD) police officers while he was lying down on a concrete slab adjacent to an apartment complex on Waikīkī beach.  Several police officers approached him intending to address whether certain items (namely, charcoal embers, cooked meat, and empty beer bottles) in the vicinity belonged to him.  When an officer asked Weldon to provide his identification, he provided a Veterans Affairs (VA) medical card to the officer.

After Weldon handed the medical card to the police officer, the officer noticed that Weldon was grasping something in his backpack, and ordered Weldon to take his hand out of the backpack.  Weldon refused.  A second officer then pulled the bag from Weldon.  As the officer pulled the bag away, an eight-inch collapsible baton fell out of the backpack.  Weldon grabbed the baton and pulled it up to the right side of his head as if to

brandish it. The police officers eventually wrested control of the baton away from Weldon and arrested him. Respondent/Plaintiff-Appellant State of Hawai'i (the State) later charged Weldon with one count of carrying a deadly weapon in violation of Hawai'i Revised Statutes (HRS) § 134-51(a).

The Circuit Court of the First Circuit (circuit court) granted Weldon's motion to suppress evidence of the baton. The State appealed, and the Intermediate Court of Appeals (ICA) vacated the circuit court's order granting Weldon's motion to suppress, concluding that the seizure was incident to a valid weapons search. Weldon filed an application for writ of certiorari.

We reverse the ICA's judgment on appeal. On the facts of this case, the police lacked reasonable suspicion to seize Weldon while he was lying next to the beach in Waikīkī. Accordingly, the police violated Weldon's constitutional rights by approaching him, asking for identification, and seizing his backpack. Evidence from this unconstitutional search and seizure must be suppressed.

## I. BACKGROUND

### A. Circuit Court Proceedings[1]

On November 4, 2013, the State charged Weldon via an amended complaint with one count of carrying a deadly weapon in violation of HRS § 134-51(a).[2]

On April 21, 2014, Weldon filed a Motion to Suppress Evidence (Motion to Suppress), and argued that the circuit court should suppress evidence and statements obtained from the warrantless search and seizure of Weldon. He argued that the police officers violated his constitutional rights under the United States Constitution and under article I, section 7 of the Hawai'i Constitution.[3] Weldon contended that prior to being

---

[1] The State originally filed a complaint in the District Court of the First Circuit on June 5, 2013. Weldon demanded a jury trial, and the district court committed his case to circuit court on September 11, 2013.

[2] HRS § 134-51(a) (2011) provides:

> **Deadly weapons; prohibitions; penalty.** (a) Any person, not authorized by law, who carries concealed upon the person's self or within any vehicle used or occupied by the person or who is found armed with any dirk, dagger, blackjack, slug shot, billy, metal knuckles, pistol, or other deadly or dangerous weapon shall be guilty of a misdemeanor and may be immediately arrested without warrant by any sheriff, police officer, or other officer or person. Any weapon, above enumerated, upon conviction of the one carrying or possessing it under this section, shall be summarily destroyed by the chief of police or sheriff.

[3] Article I, section 7 of the Hawai'i Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported
>
> (continued...)

4

detained and questioned by the police officers, Weldon "was not engaged in any overt violation of any criminal law." Weldon stated that under our case law, "[p]olice may not randomly 'encounter' individuals without an objective basis for suspecting them of misconduct and then place them in a coercive environment in order to develop reasonable suspicion to justify their detention." Thus, Weldon concluded that "it was only by virtue of the unlawful conduct of the police officers that the alleged deadly weapon became visible to the police officers," and "[a]ccordingly, all evidence seized subsequent to the detention and questioning of Mr. Weldon was tainted . . . and must be suppressed as fruits of the unlawful seizure."

In its memorandum in opposition to Weldon's Motion to Suppress, the State argued that the police officers "had a reasonable suspicion that criminal activity was afoot." Specifically, the State contended:

> The articulable facts in support of the Officers' belief stop [sic] include, but are not limited to, the observation of the alcoholic beverage containers, the charcoal residue of an extinguished fire, and discarded cooked meat that were in close proximity to the Defendant. If the Defendant had the alcoholic beverages and extinguished fire on the beach/beach access these would be in violation of the R.O.H. 40-1.2(a) and H.A.R. 13-13-24(4) as indicated supra. Officers also indicated that when they were talking to the Defendant he was sitting on the property break wall of 2801

---

[3](...continued)
by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

> [C]oconut Avenue. [The officer] confirmed that the
> Defendant did not live in the condos and could be possibly
> violating H.R.S. 708-815.[4] Officers had a reasonable
> suspicion that criminal activity was afoot and detained the
> Defendant to investigate but did not have probable cause to
> arrest the Defendant.

The circuit court held a hearing on Weldon's Motion to Suppress on June 16, 2014.[5] Two HPD police officers, Officer Heyworth and Officer Wilson, testified.

### 1. Officer Heyworth's Testimony

Officer Heyworth testified that on June 4, 2013, he was assigned to patrol the Waikīkī area. He stated that part of the patrol area included the area around 2801 Coconut Avenue, which was "a particular hot spot, that block." He testified that when he arrived at the address around 7:00 a.m., he noticed "discarded embers from a fire, um, meat, cooked meat strewn everywhere, and, uh, beer bottles. [He] also noticed a male about five to six feet away from them, uh, laying down." He identified the male as Weldon. Officer Heyworth stated that he approached Weldon because he "wanted to address, uh, the items, see, you know, if they were his. So I just went up to him to talk to him." Upon approaching Weldon, Officer Heyworth noticed that Weldon was mumbling, slow to respond, and not necessarily cooperative when

---

[4] However, a police officer later testified that the beach area where Weldon was lying down was accessible to the public. The officer did not check to determine whether there were signs indicating that the concrete slab or retaining wall where Weldon was lying was private property. He also stated that no trespass case was created against Weldon.

[5] The Honorable Lono J. Lee presided.

he was asked for his name and identification. Weldon eventually went into his backpack and provided him with a VA medical card. By this time, Officer Wilson had also arrived on the scene.

Officer Heyworth explained that after handing over his VA medical card, Weldon continued to grasp something inside the backpack. While Officer Heyworth could not see what he was grasping, he ordered Weldon to remove his hand from the backpack.

When Weldon refused to remove his hand from the backpack, Officer Heyworth stated that Officer Wilson attempted to grab the backpack away, and when he succeeded in pulling the bag away, a collapsible baton fell on the concrete area beside Weldon. Officer Heyworth testified that Weldon picked the baton up "and brought it to the right ear, his right ear, and brandished it in a manner as if to strike me or Officer Wilson." Recognizing the baton as a deadly weapon, Officer Heyworth told Weldon to drop the baton and that he was under arrest.

On cross-examination, defense counsel asked Officer Heyworth why he had visited 2801 Coconut Avenue that morning. Officer Heyworth responded that there were general complaints from residents in the area about a high level of burglaries, so he was "making checks of the area." Officer Heyworth clarified that he was not responding to any specific complaint or call.

Defense counsel then showed Officer Heyworth a photograph of the beach side of 2801 Coconut Avenue and asked him to indicate where he saw Weldon and where he saw the items that led him to further investigate Weldon. Officer Heyworth responded that Weldon may have been lying down towards the right side of the photograph, and that the "discarded embers from a fire" were not in the area depicted by the photograph. He testified that there was no "fire pit or barbecue grill" in the area. He further stated that at the time that he approached Weldon, Weldon was not drinking any beer or alcohol, was not eating any food, and was not using illicit drugs.

Officer Heyworth testified that he approached Weldon to "address his welfare after observing those items." Defense counsel asked, "just to clarify, based on the observations of the beverage containers, the residue of the fire, and the disregarded meat, those were the - I guess the factors that led you to believe that there was some type of criminal activity going on?" Officer Heyworth responded, "I wanted to determine if they were - they were his." When asked whether he had ever questioned Weldon about whether the items were his, Officer Heyworth responded that "[t]he first thing I asked was his name I believe."

8

### 2.    Officer Wilson's Testimony

Officer Wilson testified that when he arrived at 2801 Coconut Avenue, he initially saw Weldon, "several bottles, uh, a barbecue, and some meat that had been barbecued . . . [and] several backpacks." He stated that the glass bottles were empty, and "they appeared to be of the alcoholic type beverage and maybe some soda bottles." Officer Wilson testified that when he arrived on the scene, he initially observed Weldon lying down on the "concrete pad." Officer Wilson stated that "basically we approached, we asked for ID, tried to identify who this is." He explained that "we" referred to Officer Heyworth, himself, and a third officer who arrived shortly after.

When Weldon failed to comply with Officer Heyworth's instruction that he "not go into his bag," Officer Wilson testified that he pulled the bag away from Weldon, and he "immediately recognized in [Weldon's] right hand a collapsible baton." Officer Wilson testified that Weldon "pulled his right hand back with the baton. At that time it extended."

On cross-examination, when shown the same photograph of the area as shown to Officer Heyworth, Officer Wilson indicated that Weldon had been lying down in the middle of the photograph. He also stated that the charcoal type grill and the glass bottles

were on Weldon's left, and the backpacks on Weldon's right.[6]
When asked why he approached Weldon, Officer Wilson replied, "we
were in the area making routine checks identifying people.  Uh,
we could do it – at that time we were doing it, uh, daily."
Officer Wilson also stated that while Weldon was brandishing the
baton, he was sitting up, and "[h]is legs were still forward flat
on the concrete."

On recross-examination, Officer Wilson testified that
while tenants of the apartment building above the concrete wall
could access a locked gate that led into the apartment, "you
can't, um, stop access to the beach area."  Officer Wilson stated
that he was not sure whether there were signs on the wall
denoting that the area was private property, or stating "keep off
this wall."  Officer Wilson further testified that no trespass
case was created against Weldon.

### 3.    Circuit Court Order Granting Motion to Suppress

During closing arguments, the State and defense counsel
disputed whether the officers had reasonable suspicion to believe
that Weldon was engaged in criminal activity.  The State argued
that the officers had individualized suspicion to approach Weldon
to investigate possible criminal activity.  Defense counsel

---

[6]     This appears to contradict Officer Heyworth's testimony, in which
he stated that he did not see any physical barbecue grill, but just some
remaining embers from a fire.

countered that the officers lacked reasonable suspicion to approach Weldon because "there's nothing in evidence to show that Mr. Weldon is connected in time to these, you know, bottles or grill." Defense counsel also stated that when the officers approached Weldon, they did not inquire whether the items were his, but first asked for his identification. At the conclusion of the hearing, the circuit court orally granted Weldon's Motion to Suppress.

The circuit court entered its written Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Evidence (Order Granting Motion to Suppress) on July 8, 2014. Therein, the circuit court made the following findings of fact and conclusions of law:

> 1. Police officers may stop and detain an individual if the officers have reasonable suspicion that the person stopped was engaged in criminal conduct.
>
> 2. Police officers, in that situation, must be able to point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.
>
> 3. In this case, there was reasonable suspicion for the police officers to approach Defendant and investigate based upon the past complaints of criminal activity in the area and the proximity of bottles, cooked meat, and extinguished fire to Defendant.
>
> 4. However once detained there was no reasonable suspicion for the police officers to search Defendant's backpack based on the articulable facts and circumstances known at that time.
>
> 5. Therefore, Defendant's Motion to Suppress Evidence is granted.

11

Stated differently, while the circuit court determined that the officers had reasonable suspicion to approach Weldon and inquire as to the items located around him, the circuit court concluded that the officers did not have reasonable suspicion to subsequently search Weldon's backpack.

**B.    ICA Proceedings**

The State filed a notice of appeal.  In its opening brief, the State argued that the circuit court erred in suppressing evidence of the baton because "the discovery of the baton was the result of a valid protective weapons search."  The State disputed the circuit court's fourth conclusion of law, and noted that it was reasonable for the officers to conduct a weapons search once they saw Weldon "grasping something" in his backpack.  The State cited the United States Supreme Court's (Supreme Court) decision in Terry v. Ohio, 392 U.S. 1, 30-31 (1968), in which the Supreme Court stated:

> where nothing in the initial stages of the encounter serves to dispel [a police officer's] reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

Here, the State argued that Officer Wilson testified that "[a]t no time were we trying to search [Weldon's] belongings," and noted that Officer Wilson "simply pulled the bag

12

away from Weldon and 'immediately recognized in [Weldon's] right hand a collapsible baton.'"  Once Officer Wilson saw the baton, the State argued that under the totality of the circumstances, he was justified in taking measures to neutralize the threat of harm to himself and to others.  (Citing State v. Uddipa, 3 Haw. App. 415, 418, 651 P.2d 507, 510-11 (1982)).  Because the weapons search was reasonable, the State requested that the ICA vacate the circuit court's Order Granting Motion to Suppress.

In his answering brief, Weldon argued that the circuit court did not err in granting his Motion to Suppress.  Weldon contended, however, that the baton was correctly suppressed because under the totality of the circumstances, the officers had "no specific and articulable facts indicat[ing] that Weldon had been or was about to be engaged in criminal activity."

Thus, Weldon argued that the circuit court's third conclusion of law stating that the police officers had reasonable suspicion to approach Weldon, was unsupported by the evidence.[7] Weldon noted that in State v. Barnes, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977), this court stated:

> To justify an investigative stop, short of an arrest based on probable cause, "the police officer must be able to point to specific and articulable facts which, taken

---

[7]  Weldon argued that the ICA could affirm the circuit court's Order Granting Motion to Suppress on different grounds than those found by the circuit court.  (Citing Strouss v. Simmons, 66 Haw. 32, 40, 657 P.2d 1004, 1010 (1982)).

13

> together with rational inferences from those facts, reasonably warrant that intrusion." [Terry, 392 U.S. at 21]. The ultimate test in these situations must be whether from these facts, measured by an objective standard, a [person] of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate.

Weldon argued that in this case, "[t]he police had no reasonable suspicion to temporarily detain Weldon because they could point to no specific and articulable facts that Weldon was involved in any criminal activity." Here, although Officer Heyworth claimed that Weldon was "five to six feet" from the cooked meat, the charcoal embers, and the glass bottles, when shown a picture of the beach and foundational wall, he also stated that the discarded charcoal was located outside the immediate area around Weldon. Weldon therefore argued that the officers' suspicions that he was the source of the strewn items were unreasonable. Weldon also stated that according to the officers' testimony, Weldon was lying down, apparently sleeping or resting, not eating or drinking, and "was not doing anything else illegal or suspicious." Therefore, Weldon concluded that "a [person] of reasonable caution would [not] be warranted in believing that Weldon was involved in any criminal activity, so the police's intrusion on him was [not] appropriate, and the circuit court properly suppressed the billy/baton."

On April 25, 2018, the ICA entered a memorandum opinion vacating the circuit court's Order Granting Motion to Suppress.

14

State v. Weldon, No. CAAP-14-0001042, 2018 WL 1940952 (App. Apr. 25, 2018) (mem.).  The ICA concluded that (1) the officers had reasonable suspicion to approach Weldon and temporarily detain him for questioning, and (2) once the officers saw Weldon grasp something from his backpack, the officers had a reasonable basis to infer that Weldon was armed and dangerous, and could seize the backpack.

In concluding that the officers had reasonable suspicion to approach Weldon, the ICA noted that the "empty beer bottles, strewn cooked meat, and discarded embers from a fire on the beach . . . were in close proximity to Weldon, who was the only person in the vicinity."  Because it is a crime to possess an open container of intoxicating liquor on the beach, Revised Ordinances of Honolulu §§ 40-1.2, 10-1.1 (1990), and to knowingly drop, place, or throw litter on any public or private property, HRS § 708-829 (Supp. 2006), the ICA concluded that Weldon's close proximity to these items "provided the police with a reasonable suspicion that criminal activity involving Weldon was afoot." Thus, the ICA also concluded that the officers could momentarily detain Weldon.

In concluding that the officers also had reasonable suspicion to search Weldon's backpack, the ICA first noted that Hawai'i case law allows police officers to conduct protective

15

searches for weapons during an investigative detention if the officers can reasonably infer from the detained person's specific conduct and from attendant circumstances that the person is armed and presently dangerous. (Citing State v. Ortiz, 67 Haw. 181, 185, 683 P.2d 822, 826 (1984)). When Officer Heyworth saw Weldon grasp something in his backpack, and when Weldon refused to comply with the officers' demands to remove his hand from the backpack, the ICA determined that Officer Wilson's actions in seizing the backpack were justified as a valid protective search for weapons. The ICA thus concluded that the officers' recovery of the baton did not violate Weldon's constitutional rights.

Accordingly, the ICA vacated the Order Granting Motion to Suppress and remanded the case for further proceedings. The ICA entered its judgment on appeal on May 24, 2018.

D.  **Notice of Weldon's Death**

Weldon timely filed an application for writ of certiorari on July 25, 2018. We accepted his application on August 28, 2018 and scheduled the case for oral argument.

On November 2, 2018, the Office of the Public Defender (OPD) notified this court that it believed Weldon had passed away on April 22, 2018. Pursuant to Hawai'i Rules of Appellate

16

Procedure (HRAP) Rule 43(a),[8] OPD requested that it be substituted as the party-in-interest for Weldon.  We denied OPD's Motion for Substitution, and ordered OPD to "make reasonable efforts to locate an individual or entity to serve as personal representative for [Weldon]."

After oral argument was held, OPD informed us that, despite its efforts, it could not find a proper personal representative to substitute for Weldon.

## II.   STANDARD OF REVIEW

### A.   Motion to Suppress

"An appellate court reviews a ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'"  State v. Tominiko, 126 Hawai'i 68, 75, 266 P.3d 1122, 1129 (2011) (quoting State v. Prendergast, 103 Hawai'i 451, 453, 83 P.3d 714, 716 (2004)).

---

[8]      HRAP Rule 43(a) (2010) provides in relevant part:

(a) Death of a party. If a party dies after the notice of appeal is filed, or while the proceeding is otherwise pending in a Hawai'i appellate court, that court may substitute the personal representative of the deceased party as a party on motion filed by the representative or by any party.  The motion shall be served upon the representative in accordance with the provisions of Rule 25.  If the deceased party has no representative, any party may suggest the death on the record, and proceedings shall then be had as that court shall direct. . . .

## III. DISCUSSION

Weldon presents one question on certiorari: "[w]hether the ICA gravely erred in holding that the Circuit Court erred in granting Weldon's Motion to Suppress because the police seized Weldon without specific and articulable facts supporting reasonable suspicion to believe he was committing a crime."

As an initial matter, we note that it was after we had accepted Weldon's application for writ of certiorari that OPD informed us that Weldon had passed away. Pursuant to HRAP Rule 43(a), we exercise our discretion to address the important constitutional issues raised on certiorari.

We further conclude that because Weldon was seized without reasonable suspicion that he was engaged in criminal activity, his seizure was illegal. Because Weldon's seizure was illegal, the evidence obtained from that illegal seizure, i.e., the baton, is tainted and inadmissible at trial. This illegally-obtained evidence must therefore be suppressed.

### A. HRAP Rule 43(a)

Weldon passed away during the pendency of the State's appeal to the ICA, and this court was notified of his death after we accepted his application for writ of certiorari. We later denied OPD's motion to substitute itself as Weldon's personal representative.

18

If a party dies "while the proceeding is otherwise pending in a Hawai'i appellate court," HRAP Rule 43(a) permits, by motion, the substitution of a personal representative of the deceased party as a party.  If a deceased party has no representative, HRAP Rule 43(a) also provides that "any party may suggest the death on the record, and proceedings shall then be had as that [appellate] court shall direct."

In State v. Makaila, 79 Hawai'i 40, 45, 897 P.2d 967, 972 (1995), we applied HRAP Rule 43(a) and determined that if a criminal defendant dies pending appeal of a conviction, an appellate court, in its discretion, may allow for substitution of a proper party-defendant.  We also stated, absent a motion for substitution, that an appellate court may (1) dismiss the appeal as moot, (2) vacate the judgment of conviction and dismiss all related criminal proceedings, or (3) enter any other order as the appellate court deems appropriate pursuant to HRAP Rule 43(a). Id.  We therefore vacated our earlier order dismissing the deceased criminal defendant's appeal to allow any party to move to substitute a proper party-defendant.  Id. at 46, 897 P.2d at 973.

Here, Weldon was never convicted of the crime for which he was charged.  Therefore, the specific facts in Makaila differ from the facts of this case.  Nevertheless, HRAP Rule 43(a),

19

which applies to any proceeding pending in a Hawaiʻi appellate court, remains applicable. According to HRAP Rule 43(a), when a proper party representative is not substituted, we may dismiss an appeal, vacate the ICA's judgment on appeal, or enter any other order we deem appropriate. See Makaila, 79 Hawaiʻi at 45, 897 P.2d at 972 (citing HRAP Rule 43(a)). We therefore exercise our discretion to address the important constitutional issues raised on certiorari. See State v. Burrell, 837 N.W.2d 459, 467 (Minn. 2013) (identifying public policy considerations which support the continuation of a deceased criminal defendant's appeal).

**B.    The police unlawfully seized Weldon, and therefore the evidence from the unlawful seizure must be suppressed.**

Pursuant to article I, section 7 of the Hawaiʻi Constitution, the people have a right to be free from unreasonable searches, seizures, and invasions of privacy. In order to determine whether a person can be lawfully seized without first obtaining a warrant, we analyze the following.

First, we determine whether the person was "seized" within the meaning of the United States and Hawaiʻi Constitutions. Second, if the person was seized, we determine whether the seizure was lawful, i.e., whether the police could have temporarily detained the individual because "they have a reasonable suspicion based on specific and articulable facts that

20

criminal activity is afoot." Tominiko, 126 Hawaiʻi at 77, 266 P.3d at 1131. If the seizure was not supported by reasonable suspicion, the seizure was unlawful, and any evidence obtained as a result of the initial seizure is inadmissible at trial.

We conclude here that Weldon was seized without reasonable suspicion that he was engaged in criminal activity. Accordingly, the evidence discovered on the basis of that unlawful seizure must be suppressed.

1.  **When the police approached Weldon and proceeded to question him, they seized him within the meaning of article I, section 7 of the Hawaiʻi Constitution.**

As a threshold matter, Weldon was "seized" within the meaning of article I, section 7 of the Hawaiʻi Constitution. This court has stated that:

> A person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews de novo. A person is seized for purposes of article I, section 7 of the Hawaiʻi Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information.

Tominiko, 126 Hawaiʻi at 77, 266 P.3d at 1131 (citations and quotations omitted). We examine whether a person is seized on a case by case basis, keeping in mind that a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [the person] was not

21

free to leave." State v. Quino, 74 Haw. 161, 169, 840 P.2d 358, 362 (1992).

We have previously held that an informal inquiry with a person on the street in which there is no compulsion to cooperate is not a seizure within the meaning of article I, section 7. State v. Tsukiyama, 56 Haw. 8, 13, 525 P.2d 1099, 1103 (1974). However, we have also held that when officers deliberately initiate their encounter with a person for the specific purpose of investigating a crime, and their questioning is "specifically designed to elicit responses that would either vindicate or implicate [the person]," officers have seized the individual within the meaning of article I, section 7. Quino, 74 Haw. at 171-72, 840 P.2d at 363-64. The use of physical force is not necessary to effect a seizure; rather, the test is whether "a reasonable person in [the defendant's] position would not have believed that [the person] was free to ignore the officer's inquiries and walk away." Id. at 173, 840 P.2d at 364.

Here, at 7:00 a.m., Officer Heyworth approached Weldon in the course of a regular patrol and not through any specific complaint. After observing discarded embers from a fire, strewn cooked meat on the sand, and glass bottles, Officer Heyworth approached Weldon, who was lying down at the time, to "see, you know, if [these items] were his." Officer Heyworth, in full

22

police uniform, initiated a conversation and immediately requested identification.  By this point, Officer Wilson had also arrived at the scene and had also approached Weldon.  A third police officer arrived shortly thereafter.

Based upon the totality of the circumstances, we conclude that a reasonable person in Weldon's position would not feel free to ignore Officer Heyworth's inquiries and walk away.  Even if Officer Heyworth never specifically asked Weldon whether the items found in his vicinity were his, this court has previously concluded that under certain circumstances, asking for identification and information can rise to a seizure under article I, section 7 if an officer approaches that person for the express or implied purpose of investigating him for possible criminal violations.  See State v. Kearns, 75 Haw. 558, 568, 867 P.2d 903, 908 (1994).  Here, the officers admitted that they approached Weldon with the express purpose of investigating him for possible criminal violations.

Additionally, when Officer Heyworth asked Weldon to give his name and to show identification, at least two officers, and likely three, had surrounded him.  To a reasonable person in Weldon's position, this "show of authority" would make it

difficult for the person to believe that the person was free to ignore the officer's inquiries and walk away.[9]

Finally, there is nothing in the record to indicate that Weldon ever consented to the seizure.  Even though Weldon had eventually given his identification to the officers, this court has held that "mere acquiescence to questioning, in and of itself, is insufficient to establish consent to the seizure." Kearns, 75 Haw. at 571, 867 P.2d at 909.  Based on the totality of the circumstances, we conclude that Weldon was seized pursuant to article I, section 7 of the Hawai'i Constitution.

### 2. **Weldon's seizure was not supported by reasonable suspicion that he was engaged in criminal activity**.

Generally, a seizure without a warrant is presumed invalid unless the State proves that the seizure falls within an exception to the warrant requirement of article I, section 7 of the Hawai'i Constitution.  State v. Heapy, 113 Hawai'i 283, 290, 151 P.3d 764, 771 (2007).  One such exception is a temporary investigative stop where an officer has "reasonable suspicion" that the person stopped was engaged in criminal conduct.  Kearns, 75 Haw. at 569, 867 P.2d at 908.

> To justify an investigative stop, short of an arrest based on probable cause, the police officer must be able to

---

[9]    As Justice Stewart once opined, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers . . . ." United States v. Mendenhall, 446 U.S. 544, 554 (1980) (Opinion of Stewart, J.).

24

> point to specific and articulable facts which, taken
> together with rational inferences from those facts,
> reasonably warrant that intrusion.  The ultimate test in
> these situations must be whether from these facts, measured
> by an objective standard, a [person] of reasonable caution
> would be warranted in believing that criminal activity was
> afoot and that the action taken was appropriate.

Tominiko, 126 Hawai'i at 77-78, 266 P.3d at 1131-32 (emphasis and quotations omitted) (quoting Barnes, 58 Haw. at 338, 568 P.2d at 1211).  We have additionally stated that officers must have a "particularized and objective" basis for suspecting that the person seized has committed or is about to commit a crime.  Id. at 78, 266 P.3d at 1132.  In other words, reasonable suspicion must be based on "a suspicion that the particular individual being stopped is engaged in wrongdoing."  State v. Uddipa, 3 Haw. App. 415, 418, 651 P.2d 507, 510 (1982) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

Weldon argues that the officers here could not have reasonably suspected that he was engaged in criminal activity.[10] He cites this court's decision in Tominiko as analogous to the circumstances in his case.

_____

[10]    In response to Weldon's application, the State contends that Weldon waived this argument because he failed to challenge the circuit court's specific conclusion that the officers had reasonable suspicion "to approach [Weldon] and investigate."  The State notes that Weldon did not file a cross-appeal challenging the circuit court's conclusion.
    However, Weldon specifically argued in his answering brief to the ICA that the circuit court's conclusion on this point was erroneous, he explained in great detail that the officers did not have reasonable suspicion to approach him in the first place, and he noted that the ICA could affirm the circuit court's order on other grounds.  Therefore, we reject the State's waiver argument.

In Tominiko, a police officer was called to address a large gathering of people seen drinking beer and soda at an intersection. 126 Hawaiʻi at 70, 266 P.3d at 1124. The group eventually dispersed, and the defendant walked back to his car. Id. The officer trailed the defendant and asked to see his identification, but the defendant mumbled something, kept walking, got into his car, and slowly began to drive away. Id. at 72, 266 P.3d at 1126. The defendant drove seven feet before stopping, which allowed the officer to approach the defendant's car window and observe empty beer bottles in the back of the defendant's car. Id. The defendant was later charged with operating a vehicle under the influence of an intoxicant. Id. at 71, 266 P.3d at 1125. At trial, the officer testified that he did not remember seeing the defendant with a beer bottle in his hand. Id. at 72, 266 P.3d at 1126.

We concluded that on those facts, the police officer did not have reasonable suspicion that the defendant was engaged in criminal activity. Id. at 78, 266 P.3d at 1132. The officer "admitted that he did not recall seeing [the defendant] drinking beer or holding a beer bottle in his hand when he approached the group. Additionally, [the officer] did not see [the defendant] fighting or talking loud." Id.

Just as in <u>Tominiko</u>, the facts of this case demonstrate that the officers did not have reasonable suspicion that Weldon was engaged in criminal activity. The ICA noted that possessing an open container of intoxicating liquor and littering are crimes, and concluded that Weldon's "close proximity to the open beer bottles, strewn cooked meat, and discarded fire embers on the beach constituted specific and articulable facts that provided the police with a reasonable suspicion that criminal activity involving Weldon was afoot." However, nothing in the police officers' testimony reasonably ties Weldon to the items that littered the sand around him. While Officer Heyworth testified that the items were about five to six feet away from Weldon, he also testified that the "discarded embers from a fire" were not in the immediate area around Weldon. When Officer Heyworth approached Weldon, he had been lying down. Weldon was not eating or drinking and was not using drugs at the time that he was approached. The glass bottles around Weldon were empty.

Moreover, there is nothing else to infer that Weldon had at any time used the items in his vicinity, cooked the strewn meat, or drank from the empty glass bottles. Officer Heyworth testified that he did not see any plates or utensils, nor any evidence of unopened beer bottles of the same variety around Weldon. Accordingly, Officer Heyworth could not point to any

27

specific, articulable fact indicating that Weldon was or had been involved in any criminal activity.  See Tominiko, 126 Hawai'i at 78, 266 P.3d at 1132.

Furthermore, "the mere act of avoiding confrontation does not create an articulable suspicion [of criminal activity]." Id. at 79, 266 P.3d at 1133.  In Tominiko, we concluded that the defendant's actions in response to the officer asking for his identification, i.e., "mumbl[ing] something, walk[ing] to his car, and attempt[ing] to start it," did not raise a reasonable suspicion that he had committed a crime.  Id.  Here, even if Weldon was slow to respond to Officer Heyworth's request for identification and "mumbled a lot" before eventually providing Officer Heyworth with identification, this conduct similarly does not raise reasonable suspicion that he had committed a crime.

"What facts are 'specific' and 'articulable' so as to justify an investigative stop cannot be explicitly defined." Uddipa, 3 Haw. App. at 418, 651 P.2d at 510.  Rather, "the totality of the circumstances - the whole picture – must be taken into account." Id.  On the record in this case, the totality of the circumstances indicate that the police officers who stopped Weldon lacked specific and articulable facts to support a

reasonable suspicion that he was engaged in criminal activity.[11] Without reasonable suspicion, the officers' seizure of Weldon violated article I, section 7 of the Hawai'i Constitution.

3.   **The baton was a fruit of an unlawful seizure, and must be suppressed.**

We prohibit the use of evidence at trial that comes to light as a result of the exploitation of a previous illegal act of the police.  Tominiko, 126 Hawai'i at 81, 266 P.3d at 1135. In determining whether evidence is tainted by such an illegal act, this court has followed the standard laid out in the United States Supreme Court's decision in Wong Sun v. United States, 371 U.S. 471 (1963): "[a]dmissibility is determined by ascertaining whether the evidence objected to as being the 'fruit' was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint."  Tominiko, 126 Hawai'i at 81, 266 P.3d at 1135 (emphasis omitted) (quoting State v. Fukusaku, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997)).  In other words, we ask, "[d]isregarding the prior illegality, would the police nevertheless have discovered the evidence?"  State v. Trinque, 140 Hawai'i 269, 281, 400 P.3d 470, 482 (2017).

---

[11]   The circuit court therefore erred when it concluded the opposite in its July 8, 2014 Order Granting Motion to Suppress.

Here, Weldon's initial seizure was unconstitutional because the police officers did not have reasonable suspicion that Weldon was engaged in criminal activity at the time that he was approached. See Section III.B.2 supra. Therefore, Officer Wilson's subsequent seizure of Weldon's backpack stemmed from Weldon's initial illegal seizure.[12] Put differently, the police would not have discovered the baton if not for Weldon's initial illegal seizure. Tominiko, 126 Hawai'i at 81, 266 P.3d at 1135.

"Evidence obtained after the initial stop is fruit of the poisonous tree because it was discovered by exploiting [the officers'] prior illegal seizure." Id. We conclude that the officers' discovery of the baton is a fruit of the poisonous tree, and therefore cannot be used at trial. The circuit court correctly suppressed that evidence.

## IV. CONCLUSION

We conclude that both the circuit court and the ICA erred in determining that the police officers had reasonable suspicion to approach Weldon. The officers could not point to any specific facts indicating that the items found on the beach in Weldon's general vicinity were his. Thus, they did not have

_____

[12] Therefore, we need not decide whether the officers' subsequent seizure of Weldon's backpack would otherwise be legal pursuant to a valid weapons search.

reasonable suspicion to believe that Weldon was involved in criminal activity.

Weldon was unconstitutionally seized, and the evidence obtained after the initial seizure must be suppressed because it was discovered by exploiting that seizure. While the circuit court erred in concluding that the officers had reasonable suspicion to approach Weldon, the circuit court nevertheless correctly suppressed evidence of the baton.

We therefore reverse the ICA's May 24, 2018 judgment on appeal and affirm the circuit court's July 8, 2014 Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Evidence. Accordingly, for the reasons stated, the case is dismissed with prejudice.

| | |
|---|---|
| Alan J.T. Komagome<br>Jon N. Ikenaga, and<br>Phyllis J. Hironaka,<br>for petitioner/defendant-<br>appellee | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama<br><br>/s/ Sabrina S. McKenna |
| Brian R. Vincent<br>for respondent/plaintiff-<br>appellant | /s/ Richard W. Pollack<br><br>/s/ Michael D. Wilson |

