**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-23-0000368**
**19-AUG-2024**
**07:54 AM**
**Dkt. 96 SO**

CAAP-23-0000368

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
OSCAR KANOA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 1CPC-22-0001037)

SUMMARY DISPOSITION ORDER
(By: Leonard, Acting Chief Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Oscar Kanoa (**Kanoa**) appeals from the March 29, 2023 Judgment of Conviction and Sentence; Notice of Entry (**Judgment**) entered by the Circuit Court of the First Circuit (**Circuit Court**).[1] After a jury trial, Kanoa was convicted of Manslaughter under Hawaii Revised Statutes (**HRS**) § 707-702 (2014 & Supp. 2023).[2] Kanoa also challenges the

---

[1] The Honorable Rowena A. Somerville presided.

[2] HRS § 707-702 states:

> **§ 707-702 Manslaughter.** (1) A person commits the offense of manslaughter if:
>
> > (a) The person recklessly causes the death of another person; or

(continued...)

Circuit Court's grant of the State's November 29, 2022 Motion to Determine Voluntariness of Defendant's Statements to the Police (**Voluntariness Motion**)[3] and denial of Kanoa's December 27, 2022 Motion for Judgment of Acquittal (**Motion for Judgment of Acquittal**).

Kanoa raises two points of error on appeal, contending that the Circuit Court erred in: (1) granting the Voluntariness Motion; and (2) denying the Motion for Judgment of Acquittal.

---

[2](...continued)
> (b) The person intentionally causes another person to commit suicide; provided that this section shall not apply to actions taken under chapter 327L.
>
> (2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be; provided that an explanation that is not otherwise reasonable shall not be determined to be reasonable because of the defendant's discovery, defendant's knowledge, or the disclosure of the other person's actual or perceived gender, gender identity, gender expression, or sexual orientation, including under circumstances in which the other person made an unwanted nonforcible romantic or sexual advance toward the defendant, or in which the defendant and the other person dated or had a romantic relationship. If the defendant's explanation includes the discovery, knowledge, or disclosure of the other person's actual or perceived gender, gender identity, gender expression, or sexual orientation, the court shall instruct the jury to disregard biases or prejudices regarding the other person's actual or perceived gender, gender identity, gender expression, or sexual orientation in reaching a verdict.
>
> (3) Manslaughter is a class A felony.

[3] The Voluntariness Motion sought determinations of voluntariness on additional statements, including Kanoa's 911 call, statements to Emergency Medical Services (**EMS**) and Honolulu Fire Departmart (**HFD**) personnel, and utterances upon Kanoa's later arrest on August 18, 2022. However, the admissibility of these other statements is not challenged on appeal and these aspects of the motion are not discussed herein.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Kanoa's points of error as follows:

(1) Kanoa argues that the Circuit Court erred in granting the Voluntariness Motion because (a) his detention was not a valid investigative stop because Honolulu Police Department (**HPD**) officers detained him to attend to a medical emergency, not because they suspected criminal activity, and (b) even if HPD officers validly detained Kanoa to obtain medical information, prolonging his detention for more than 47 minutes was longer than necessary. Kanoa submits that his detention, initiated by HPD Officer Alberto Yerena (**Officer Yerena**) at 3:53 a.m., was invalid; thus, all statements made by Kanoa in response to questions and statements directed toward him by the HPD officers between 3:53 a.m. and approximately 4:40 a.m. (when Kanoa was freed to leave) are inadmissible as fruit of the poisonous tree.

The State argues that under the totality of the circumstances, the officers' seizure of Kanoa was reasonable because he was the only person on the scene, and the only witness capable of providing statements to assist medical personnel in administering care for an unresponsive person at the scene, Bonnie Vierra (**Vierra**). The State argues that Kanoa was not in custody because, *inter alia*, he was free to move, smoke cigarettes, and make phone calls during the period of his detention. The State contends that the officers' questions did not amount to an interrogation because the questions were neither

sustained nor coercive.  The Circuit Court agreed with the

State's reasoning and stated:

> [S]o was [Kanoa] in custody and was [Kanoa] under interrogation?
>
> . . . .
>
> So looking at the totality of the circumstances, yes, there was a discussion regarding whether [Kanoa] was a suspect or not, and I believe that was in conjunction with them discussing whether or not this was going to be an unattended death, and if it was going to be an unattended death, then they would have to get a statement from [Kanoa].
>
> While probable cause is not the end-all be-all, there was no probable cause in this case.  As the -- State pointed out, a criminal case was never initiated at this point and an [injury cared for (**ICF**) report] was initiated instead.  I would also note that after . . . the officers discuss at the back of the ambulance whether he's a possible suspect or make him a suspect, the next inquiry is maybe we should check his hands.  So they go over and they ask him to show their hands -- to show his hands, and they conclude that there was nothing wrong with his hands.  And at that point he continues talking to -- talking to -- to the police officers.  At one point [Kanoa] does ask how long do I have to sit in this spot, you're saying I cannot leave, and the response was you have to sit there until whatever it takes. And they were waiting for their boss to call back because they needed him to make a statement.
>
> At no time during this -- this 40 or 50 minutes of him standing outside was he ever considered a suspect.  There was no probable cause.  He was walking around, smoking cigarettes, joking around with the police officers, making phone calls.  So with respect -- with respect to *State versus Ketchum*, looking at the temporary detention and the factors associated with it, he was not handcuffed, he was not led to a different location, he was not subject to booking procedures, there was no force, and there was no show of authority beyond the inherent -- beyond that inherent in the mere presence of the police officers.
>
> So pursuant to *State versus Sagapolutele-Silva*, *Ketchum*, and *Ah Loo*, I do find that while [Kanoa] may have been detained, he was not in custody and they were -- although it was a 40- to 50-minute time frame, it was temporary and they temporarily detained him for questioning, and they did not pose any coercive questions to the detain -- to [Kanoa].  They simply asked him to write a 252 [written statement].

Although the Circuit Court's analysis was based on

grounds in Hawaiʻi cases on custodial interrogation, Kanoa's

argument is that the Circuit Court erred in allowing his

statements into evidence because they were obtained as a result of an unlawful seizure.  The Hawaiʻi Supreme Court has held:

> Pursuant to article I, section 7 of the Hawaiʻi Constitution, the people have a right to be free from unreasonable searches, seizures, and invasions of privacy. In order to determine whether a person can be lawfully seized without first obtaining a warrant, we analyze the following.
>
> First, we determine whether the person was "seized" within the meaning of the United States and Hawaiʻi Constitutions.  Second, if the person was seized, we determine whether the seizure was lawful, i.e., whether the police could have temporarily detained the individual because "they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot." [State v. Tominiko, 126 Hawaiʻi 68, 77, 266 P.3d 1122, 1131 (2011)]. If the seizure was not supported by reasonable suspicion, the seizure was unlawful, and any evidence obtained as a result of the initial seizure is inadmissible at trial.
>
> . . . .
>
> A person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave.  Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews *de novo*.  A person is seized for purposes of article I, section 7 of the Hawaiʻi Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information.

State v. Weldon, 144 Hawaiʻi 522, 531-32, 445 P.3d 103, 112-13 (2019) (quoting Tominiko, 126 Hawaiʻi at 77, 266 P.3d at 1131 (2011)).

Here, the State acknowledges that Kanoa was detained.[4] The question remains if Kanoa was unlawfully detained or seized. If so, then all evidence gathered as a result of the unlawful seizure must be suppressed as fruit of the poisonous tree.  Id. at 534, 445 P.3d at 115; see also State v. Iona, 144 Hawaiʻi 412, 416, 443 P.3d 104, 108 (2019).

---

[4] At about 3:53 a.m., Officer Yerena told Kanoa he was not free to leave.

> Given these constitutional protections, warrantless searches or seizures are presumed "invalid unless and until the prosecution proves that the search or seizure falls within a well-recognized and narrowly defined exception to the warrant requirement." State v. Prendergast, 103 Hawaiʻi 451, 454, 83 P.3d 714, 717 (2004). "If the prosecution fails to meet this burden, the evidence obtained from the illegal search will be suppressed as 'fruit of the poisonous tree.'" Id. (quoting State v. Fukusaku, 85 Hawaiʻi 462, 475, 946 P.2d 32, 45 (1997)).

Iona, 144 Hawaiʻi at 416, 443 P.3d at 108 (footnote omitted).

To be clear, the State does not contend that Kanoa's detention was based on the HPD officers' reasonable suspicion that criminal activity was afoot. Instead, the State argues that Kanoa's seizure was reasonable because he was the only person on the scene, and his statements were needed for the purpose of gathering information for Vierra's medical treatment and clarifying the circumstances surrounding her condition for the ICF police report. Kanoa had called 911, and Kanoa voluntarily answered questions posed by EMS and HFD first responders upon their arrival. Vierra had visible injuries, bruising, and was unconscious and in an apparent critical condition. HPD Corporal Jonathan Kendrick (**Corporal Kendrick**) testified that a written statement from Kanoa was requested because his oral statements were not clear; he had several versions of the events leading up to Vierra's injuries. The State contends that the duration of the seizure was caused by the inconsistent information provided by Kanoa, and that under the circumstances, they needed a written statement in order to make a clear ICF police report.

As the supreme court has often stated, a seizure without a warrant is generally presumed invalid unless the State proves that the seizure falls within an exception to the warrant

requirement of article I, section 7 of the Hawaiʻi Constitution, such as the "temporary investigative stop" based on a reasonable suspicion. However, as discussed above, the State does not rely on that exception. Rather, the State argues that it was reasonable to detain Kanoa until he told them more clearly what happened to Vierra to aid in her medical treatment, and until Kanoa provided a written statement so they could make a clear ICF police report. We note, however, EMS and HFD personnel had already questioned Kanoa about Vierra's injuries, and she was loaded into the ambulance prior to Kanoa being told that he could not leave.

Even assuming, based upon the totality of the circumstances, that a brief detention by police was reasonably supported by Vierra's critical medical condition, the State cites no "medical emergency" authority supporting Kanoa's continued detention based on his inconsistent statements and/or based on the HPD's desire to nail down a written statement from Kanoa in aid of a clear ICF police report. We conclude that Kanoa was unlawfully seized at about 3:53 a.m. on August 13, 2022, when Officer Yerena told him that he could not leave and that the evidence gathered as a result of the unlawful seizure, i.e., the oral and written statements Kanoa made to the HPD officers between approximately 3:53 a.m. and when he was allowed to leave at 4:40 a.m., were obtained as a result of that unlawful seizure.

The Circuit Court, however, did not decide the Voluntariness Motion based on whether or not Kanoa was unlawfully seized. Rather, as set forth above, the Circuit Court determined

7

that Kanoa was neither in custody nor interrogated; therefore Kanoa's rights were not violated by the 47 minutes of questioning without <u>Miranda</u> warnings after he asked if he could leave and the police said no.  Although the circumstances were factually distinct, <u>State v. Hewitt</u>, 153 Hawaiʻi 33, 526 P.3d 558 (2023), provides useful guidance.  In <u>Hewitt</u>, like in this case, there was no bright-line trigger of probable cause and it was necessary to conduct a totality of circumstances analysis.  <u>See</u> <u>id.</u> at 45-46, 526 P.3d at 570-71.

There was no probable cause to arrest Kanoa.  However, when EMS arrived on the scene, Vierra was lying in a bed, unresponsive, with injuries to her face, bruising to her eyes, swelling to the left side of her face, and blood in her nose and mouth.  Kanoa was the only other person at the scene.  With respect to how she got her injuries, Kanoa told the EMS paramedic "something about wrestling."  When the HFD captain arrived and tried to talk to Kanoa to find out what happened to Vierra, Kanoa mentioned at one point that "he got into an argument with her about text messages and that he may have pushed her."  Another firefighter testified when they were trying to figure out what happened so they could treat Vierra, Kanoa declined to say what his relationship was with Vierra, but stated that they were drinking and "they got into an argument and then there might have been a shove, . . . and then she was not conscious."

The police officers questioned Kanoa outside of Vierra's home while EMS personnel worked on Vierra inside the ambulance, continuing after the ambulance left.  The three

officers at the scene noted the injuries to Vierra's face, with HPD Officer Giancarlo Gines (**Officer Gines**) observing that both eyes were black and blue and her whole face was swollen. The police officers examined Kanoa's hands for visible injuries. Officer Gines noticed that Kanoa had little cuts and some swelling on the tops of his hands (Corporal Kendrick confirmed seeing a photo an officer snapped of swollen knuckles). One HPD officer at the scene testified he knew that Vierra and Kanoa were in a boyfriend-girlfriend relationship. One officer testified that Kanoa was not arrested that night because the police "didn't have any information or deem -- was able to deem him a suspect to be arrested." Officer Gines testified that he did not arrest Kanoa that night because the police did not believe that there was "enough probable cause to arrest him for any crime at that time." Corporal Kendrick testified that before he got there, he was called by Officer Gines and told that the injuries reported did not seem to match the injuries the victim had sustained. Corporal Kendrick testified that when he arrived, Kanoa "was not initially a suspect at that time" and that he was just a witness.

The totality of the circumstances also included that, although Kanoa was informed by the police that he was not free to leave, he was not handcuffed, he was allowed to talk on his telephone, and he was allowed to move freely around in front of Vierra's house.

We conclude that, even though the HPD officers did not have probable cause to arrest Kanoa, he was in custody at the point that he asked to leave and he was told that he was not free

to leave.  An important factor here is that the totality of the circumstances, objectively appraised, demonstrate that Kanoa was the focus of a criminal investigation, even if the initial report was categorized as a noncriminal ICF police report.  See Hewitt, 153 Hawaiʻi at 46, 526 P.3d at 571 (citing State v. Patterson, 59 Haw. 357, 361, 581 P.2d 752, 755 (1978)).  HPD officers discussed that Vierra's life-threatening injuries did not match Kanoa's 911 call.  Kanoa was the only one there; he said something about wrestling, shoving her; he had injuries on the back of his hands, swollen knuckles.  He was the boyfriend.  His statements to first responders were careful, not detailed, inconsistent.  The police discussed whether he was a suspect, but decided they did not have enough probable cause to arrest him that night.  Objectively viewed, of course he was a suspect, even if the police did not yet have probable cause to arrest him.

Other relevant circumstances include "the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, [and] the conduct of the police[.]"  Hewitt, 153 Hawaiʻi at 45, 526 Hawaiʻi at 570 (citation omitted).  The questioning took place outside of Vierra's home – not a particularly coercive setting – but was conducted in the early morning hours with Kanoa saying he needed to go because he had to get to work.  The length of the interrogation, nature of questions asked, and conduct of police went beyond any objectively reasonable means to assist EMS in treating Vierra and clearly were directed toward law enforcement objectives – one officer even told Kanoa during questioning that they had to get

his statement about what happened because "if it was just minor injuries or whatever, then she wouldn't have went to Punchbowl . . she [got] critical injuries, so we gotta investigate it like, . . . possibly she could end up dying from her injuries." While Kanoa had relative freedom compared to a person under arrest, and he was not threatened by the police, he was told he could not leave when he asked to go, and he was not allowed to leave the scene until he answered their questions and gave a written statement. Under the totality of the circumstances, Kanoa was in custody.

The Circuit Court also concluded that there was no interrogation because Kanoa was not asked any "coercive questions." However, "the touchstone in analyzing whether interrogation has taken place is whether the police officer should have known that his [or her] words and actions were reasonably likely to elicit an incriminating response from the defendant." State v. Kazanas, 138 Hawaiʻi 23, 38, 375 P.3d 1261, 1276 (2016) (citation and internal quotation marks omitted). Relying upon Rhode Island v. Innis, 446 U.S. 291 (1980), Kazanas reiterated that "interrogation consists of any express question – or, absent an express question, any words or conduct – that the officer knows or reasonably should know is likely to elicit an incriminating response." Id. (citation and internal quotation marks omitted). An incriminating response is any response, either inculpatory or exculpatory. Innis, 446 U.S. at 301 n.5.

Here, multiple police officers asked Kanoa, *inter alia*, what happened, what was his relationship with Vierra, what was

Vierra's condition when Kanoa arrived, whether she talked to him, what did she say, whether anybody else was there or if it was just Vierra and Kanoa, did Vierra have a seizure, and was she dizzy. Kanoa's post-seizure statements were obtained as a result of these questions. While a number of these questions pertained to what might have caused or contributed to Vierra's condition, the police officers knew or should have known that their words or actions were reasonably likely to elicit an incriminating response. The Circuit Court erred in concluding that the HPD officers' questioning of Kanoa did not constitute custodial interrogation. At no point was Kanoa advised of his Miranda rights.

In sum, we conclude that the Circuit Court erred in granting the Voluntariness Motion with respect to Kanoa's oral and written statements made to the HPD officers from the time that Officer Yerena told him that he was not free to leave, which was approximately 3:53 a.m., until when he was allowed to leave at 4:40 a.m., on August 13, 2022.

We necessarily consider whether there is a reasonable possibility that the error of admitting Kanoa's challenged statements might have contributed to his conviction. See State v. Haili, 103 Hawaiʻi 89, 100, 79 P.3d 1263, 1274 (2003). As the State argues, the other evidence at trial, including other unchallenged, admissible, incriminating statements made by Kanoa, is substantial. Kanoa's challenged statements to the police regarding key issues were in direct contradiction to other evidence. For example he said, when he arrived, Vierra was "all

[f—ed] up already" whereas video evidence from her home security system showed her uninjured prior to his arrival, with no one else coming in or out.  His statements to police concerning Vierra and his relationship with Vierra – while she was lying nearby in an ambulance suffering from life-threatening injuries -- cast Kanoa in an extremely negative light.  He referred to her as his "side tap," said (repeatedly), "I just come here, unload my load, and then go home."  He talked about how his wife caught him there.  His statement regarding whether he had sex with Vierra that night contradicted what he had told first responders only a short time earlier.  His statements concerning Vierra's condition were inconsistent.  Even in light of the entire record, we cannot conclude that there is no reasonable possibility that the error contributed to Kanoa's conviction.

While we conclude that the Circuit Court erred in granting the Voluntariness Motion, we must nevertheless determine whether there was substantial evidence to support Kanoa's conviction because the double jeopardy clause bars retrial should we conclude the proffered evidence is legally insufficient.  See State v. Davis, 133 Hawaiʻi 102, 118, 324 P.3d 912, 928 (2014).

(2)  Kanoa argues that there was insufficient evidence adduced at trial to prove that Kanoa committed the offense of reckless manslaughter by omission in violation of HRS §§ 707-702(1)(a), 702-203,[5] 702-206 (2014),[6] and 663-1.6(a) (2016)[7]

---

[5]     HRS § 702-203 provides:

**§ 702-203  Penal liability based on an omission.** Penal liability may not be based on an omission unaccompanied by action unless:

(continued...)

(2016). Specifically, Kanoa argues that the State presented (1) no evidence that Vierra's life could have been saved with earlier medical intervention, and (2) no evidence that Kanoa failed to call for medical intervention at the first sign that she was suffering from serious physical injury.

The Circuit Court instructed the jury as to the elements of the offense, consistent with the statutory framework, as follows:

<u>Reckless Manslaughter (Omission)</u>

As to the second alternative, a person commits the offense of Reckless Manslaughter (Omission) if he causes the death of another person by recklessly failing to obtain or attempt to obtain aid from law enforcement or medical personnel for a person suffering from serious physical harm due to a crime, a duty imposed by law upon him while present

---

[5](...continued)

    (1)    The omission is expressly made a sufficient basis for penal liability by the law defining the offense; or

    (2)    A duty to perform the omitted act is otherwise imposed by law.

[6]    HRS § 702-206 provides, in pertinent part:

**§ 702-206 Definitions of states of mind**.

. . . .

    (3)    "Recklessly"

. . . .

    (c)    A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.

[7]    HRS § 663-1.6 provides, in pertinent part:

**§ 663-1.6 Duty to assist**. (a) Any person at the scene of a crime who knows that a victim of the crime is suffering from serious physical harm shall obtain or attempt to obtain aid from law enforcement or medical personnel if the person can do so without danger or peril to any person. Any person who violates this subsection is guilty of a petty misdemeanor.

at the scene of a crime if he could do so without danger or peril to any person, and the reckless disregard that the failure to perform that duty would cause the death of the other person.

In the second alternative, there are five material elements of the offense of Reckless Manslaughter (Omission), each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That on or about August 12th, 2022, to and including August 13th, 2022, in the City and County of Honolulu, the defendant, Oscar Kanoa, was present at the scene of a crime; and

2. That the defendant knew that Bonnie Vierra was the subject of a crime and was suffering from serious physical harm; and

3. That the defendant recklessly failed to obtain or attempt to obtain aid from law enforcement or medical personnel, and he could do so without danger or peril to any person; and

4. That the defendant failed to perform that duty in reckless disregard that the defendant's failure would cause the death of Bonnie Vierra; and

5. That the defendant's failure to perform that duty caused the death of Bonnie Vierra.

Kanoa does not contend that there was insufficient evidence as to the first element or to establish that he knew Vierra was the subject of a crime, although he argues that there is no evidence that he failed to call for medical intervention at the first sign that Vierra was suffering from serious physical injury.

We review the sufficiency of evidence as follows:

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

15

State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010) (cleaned up).  With respect to the evidence sufficient to establish a defendant's state of mind, the supreme court has held:

> Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, we have consistently held that proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient.  Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances.

State v. Batson 73 Haw. 236, 254, 831 P.2d 924, 934 (1992) (cleaned up); State v. Jhun, 83 Hawaiʻi 472, 482, 927 P.2d 1355, 1365 (1996) (same).

Here, prior to Kanoa's arrival at Vierra's house, Vierra was seen uninjured, both by her mother and on surveillance footage; Vierra also did not complain to her Mother of any injuries or health issues.  Surveillance footage shows Kanoa arrived at about 8:45 p.m.  At about 9:02 p.m., Kanoa appeared to get upset with Vierra at a text message (it was established at trial she received a message from another man), Kanoa grabbed Vierra's phone and shoved her, Vierra's slippers flew off, and Kanoa pulled her into the house.  Vierra was never seen moving on the surveillance footage again.  No one else, other than Kanoa, appeared in the footage entering or leaving the house.

Evidence was adduced that Kanoa was approximately six feet tall and 260 pounds; Vierra was about five foot two and 105 pounds.  Medical evidence included that Vierra had an orbital blowout fracture, which required a significant amount of force, as well as, *inter alia,* a subdural hematoma, and multiple serious cuts and bruises over her entire face and body.  There was

16

evidence that Vierra's head was struck against a kitchen cabinet handle, which was broken, and had hair and blood stains on it. Surveillance footage after the estimated time of the assault shows Vierra on the couch, motionless, with her head resting on the back of the couch. Kanoa was seen standing over her. He was seen at one point (about 10:05 p.m.) removing a surveillance camera, and at a later point (about 12:53 a.m.), putting it back up, crooked, and in a different spot, facing out. Based on the above, all of the other evidence adduced at trial, and the reasonable inferences therefrom, we conclude that Kanoa's argument that there was no evidence that he failed to call for medical intervention at the first sign that Vierra was suffering from serious physical injury is without merit, and we further conclude there is substantial evidence to support the first four elements of the offense.

Kanoa further argues that there is no evidence that Vierra's life could have been saved with earlier medical intervention. This pertains to the final element of the offense at issue here. We conclude that there was substantial evidence adduced at trial that Kanoa's failure to seek medical help for over six hours after she sustained her injuries caused Vierra's death. Dr. Jason Brill (**Dr. Brill**), a trauma and critical care surgeon at Queen's Medical Center, was qualified to testify as an expert in the medical field of trauma and trauma surgery, and testified that he treated Vierra at about 4:00 a.m. on August 13, 2022, when she was brought in by EMS, already intubated, in critical condition. She was given a CT scan. Dr. Brill

testified that the CT scan revealed, among other things, "bleeding within the brain matter itself, brain stem hemorrhages and something called pending herniation, where the brain is pressing on the brain stem." He explained that "herniation is a process where the brain is swelling or is being pushed by blood over from one side to another and to the point that some other brain structure is being pressed on to the point that it becomes nonfunctional." He stated that "the earlier that we can treat bleeding within the brain, the better the outcome[,] but he could not "give you an exact time parameter on that though." With respect to Vierra's injuries, Dr. Brill opined, "[h]erniation does not occur immediately after any sort of brain injury and so she would've had to have sustained these injuries and then at least a few hours would've had to have occurred between sustaining the injury and when she presented to the trauma bay." The medical examiner, who qualified as an expert in forensic pathology, also testified with respect to what happened to Vierra's brain when there was bleeding and swelling due to injury and pressure gets higher and brain tissue starts dying, as happened to Vierra. Dr. Brill also testified regarding his consultation with another neurosurgeon, who opined that "he did not believe that there was any surgery that could provide any benefit [to Vierra] because she was far enough along in the brain stem herniation." (Emphasis added). Viewing all of the evidence in the light most favorable to the prosecution, we conclude that there was substantial evidence to support every element of the charged offense and thus to support Kanoa's conviction.

For the foregoing reasons, the Circuit Court's March 29, 2023 Judgment is vacated, and the case is remanded to the Circuit Court for further proceedings consistent with this Summary Disposition Order.

DATED: Honolulu, Hawaiʻi, August 19, 2024.

On the briefs:

Emlyn H. Higa,
for Defendant-Appellant.

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Acting Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge